## THE STATE v. JOHN HARRIS, Appellant.

### Division Two, February 18, 1908.

1. **INFORMATION: Unnecessary Description: Proof.** It is an accepted rule in criminal practice that if a necessary allegation is made unnecessarily minute in description, the proof must satisfy the description as well as the main part, since the one is essential to the identity of the other. But where the allegation is immaterial and surplusage, there need be no proof of it.

2. —————: —————: **Deadly Weapon: Proof.** It is unnecessary to insert in the information the words "with a deadly weapon" as descriptive of the knife with which the stabbing was done, and an information charging a felonious assault with a knife with intent to kill is sufficient without those words; and it is also unnecessary to prove that the knife was a deadly weapon when the information uses those words, for they may be considered surplusage.

3. —————: —————: —————: **Instruction.** And it being unnecessary to prove the charge in the information that the stabbing was done "with a deadly weapon," the instructions need not require the jury to find that the knife with which the stabbing was done was a deadly weapon.

4. **DEADLY WEAPON: Assumption: Presumption Arising from Use: In Instruction.** But where the proof is such that it cannot be assumed as a matter of law, either from the size of the knife used or the wound itself, that the knife was a deadly weapon, it is error for the court to instruct the jury that "he who uses upon another at some vital part a deadly weapon of any kind, must in the absence of qualifying facts be presumed to know that the effect is likely to produce death, and knowing must be presumed to intend death," etc., unless that or some other instruction requires the jury to find that the knife used was a deadly weapon.

5. —————: **Possession: Self-Defense.** An instruction which tells the jury that if defendant prepared himself with a knife and with it in hand sought and brought on the difficulty, etc., there is no self-defense in the case, is not error, and does not make the mere possession of the knife a circumstance which denied him the right of self-defense.

6. **ASSAULT: Malice Aforethought.** Under the evidence in this case, which is one for an assault with intent to kill, it was error to refuse an instruction which left it to the jury to say whether

the assault was done with malice aforethought or with an intent to kill or do some great bodily harm without malice aforethought.

7. IMPEACHMENT: Reputation: Cross-Examination. A liberal cross-examination of witnesses called by the State to rebut the defendant's attack upon the reputation of the prosecuting witness for peace, should be allowed, but the extent to which it may go is largely in the discretion of the trial court. And in this case, it is *Held* that where an attempt was made to break down the defendant's attempted showing that the prosecuting witness was a quarrelsome man, no reversible error was committed by the exclusion of a cross-examination tending to show that he had made vicious and unwarranted assaults upon others.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnston*, Judge.

·Reversed and remanded.

*William B. Skinner* for appellant.

(1) Instructions 3 and 4 are radically wrong as legal propositions, and the judgment should be reversed because of the error committed in giving them. State v. Grant, 152 Mo. 57; State v. Weeden, 133 Mo. 70; Sherwood's Com. on Crim. Law, p. 547. (2) The court should have given instruction "A," requested by defendant. Sherwood's Com. on Crim. Law, p. 141; State v. Grant, 144 Mo. 56; State v. Melton, 102 Mo. 633.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1) The information, which was accompanied by the affidavit of the prosecuting attorney, is sufficient in form and substance. Kelley's Crim Law, sec. 579; State v. Elvins, 101 Mo. 243. No error was committed in sustaining the objections of the State to questions asked by defendant's counsel of witnesses Renker, Garrison and Thurman. But, even if said objections were improperly sustained, defendant is in no position to complain, as he did not make any statement of what he

expected to prove, or make any offer of proof. Defendant has waived said error, even if error was committed. State v. Martin, 124 Mo. 514; State v. Hodges, 144 Mo. 50. (2) No error was committed by the giving of State's instruction 3, which was on the subject of the intentional use of a deadly weapon. Said instruction has been repeatedly approved by this court. State v. Grant, 152 Mo. 64. Neither was error committed in giving State's instruction 4, which was in reference to defendant bringing on the difficulty. (3) The court properly refused defendant's instruction "A," as asked by defendant. Said instruction was on the subject of an assault with intent to kill without malice. Under the evidence there were two theories: the one of an intentional and wilful assault upon the prosecuting witness with a deadly weapon, and the other justifiable conduct on the part of the defendant. There was, therefore, no half-way ground, and the trial court very properly refused to instruct the jury as requested by defendant in said instruction. State v. Bailey, 190 Mo. 257; State v. Harris, 199 Mo. 716.

GANTT, J.—On the 25th of February, 1907, the prosecuting attorney of Lawrence county filed an information, duly verified, charging that the defendant on the —— day of January, 1907, in and upon one Joe Qualls, feloniously, on purpose and of his malice aforethought, with a deadly weapon, to-wit, a knife which he, the said Harris, in his hands then and there held, did then and there make an assault, and him, the said Qualls, feloniously, on purpose and of his malice aforethought did strike, cut, stab and wound with said knife, with intent him the said Qualls then and there to kill, against the peace and dignity of the State.

At the March term, 1907, the defendant was duly arraigned and entered his plea of not guilty, and at the same term, he was put upon his trial and found guilty

as charged in the information and his punishment assessed at two years in the penitentiary. From the sentence on that verdict he appeals to this court.

The evidence on the part of the State tends to prove that the prosecuting witness, Qualls, was the proprietor of a saw mill which he was operating near the farm owned by the defendant in Lawrence county, and the defendant's minor son had been working for the prosecuting witness at said mill. On the Saturday previous to the Tuesday on which the assault was made, the son of the defendant had quit work and had complained to his father that Qualls had counted him out of a dollar in paying him his wages. The prosecuting witness testified that the defendant came to the mill on the day of the difficulty about two o'clock in the afternoon; that the prosecuting witness was very busy at the time sawing his lumber, but noticed the defendant in the mill yard, but paid little attention to him except to see that he and one Smith walked off northeast from the mill; that the next time he saw him, the defendant had come up to him into the small space in which he was working and immediately assumed a threatening attitude with his left fist up to the prosecuting witness's face and said: "What do you mean by saying that you had broken even with Harris?" and he said, "What is the matter with you, Mr. Harris?" Thereupon the defendant said: "You look me in the eyes" (then called me a vile name), "and tell me what you mean;" thereupon the prosecuting witness said: "If I have done or said anything, Mr. Harris, I did not mean a thing in the world," when he said that the defendant said: "You owe my boy a dollar," and the prosecuting witness said: "No, I paid your boy on Saturday night every cent I owed him, and you are a fool trying to raise a row with a man for nothing;" when the witness said that the defendant reached for him, caught hold of him with his left hand and struck him with his

right hand, and the witness immediately felt the cut of a knife and says, ''I either struck at him and run over him or shoved him down and run right over him, and started to run, I did not go but a few steps until I stumped my toe and fell and he came right up on me with his knife and I kicked at him with my foot, and he said, 'Damn you, I will cut your throat,' and I called to Miller and Miller came around and took hold of him. He had hold of my foot and was trying to cut over; when Miller took hold of him then defendant stopped and I jumped up and ran again and went to Dr. Cottingham's office and had him dress my wounds, on my arm and left side.'' The witness further said that the defendant stabbed him in the side the first lick he gave him, and cut him on the arm as he started to run away from him.

Dr. Cottingham testified that the prosecuting witness came to him for treatment that afternoon and he discovered that the witness had a cut in the arm, which was bleeding profusely, and the doctor dressed this wound and sewed it up and he also had a cut in the left side about the eighth rib. This last cut was about two inches deep and extended nearly to the cavity; the cut on the arm was two and a half inches long and went to the bone. The wounds had been very recently inflicted when the witness came to him.

The witness was confined to his bed on account of these wounds for some seven or eight days. On cross-examination it appeared that the prosecuting witness had become acquainted with the defendant about the first of January and this difficulty occurred on the 29th of January. The prosecuting witness had located his saw mill about one-half mile from the defendant's residence and had been using the defendant's stable that month free of charge. The son of the defendant had been working for the prosecuting witness about a week before this difficulty with the consent of his father. The

prosecuting witness was asked if he had not stated on the day before the difficulty that he had broken even with Harris, and he denied that he had ever made such a remark. He testified he was thirty-nine years old and weighed 175 pounds and was five feet and ten inches tall. On further examination, the prosecuting witness stated that the only expression he used in regard to breaking. even was in settling with another son of the defendant's about the corn that he had used in feeding his team while there, and had made an arrangement with the Davis boys for his team and said when the Davis boys came up, "I am ready for my corn, I had an even break up at Harris's, just an even break about the corn."

Miller, a witness for the State, testified that he was at the mill when the defendant came there on the day of the difficulty, and the defendant asked him what Qualls meant by breaking even with the Harrises the evening before, and witness told him he did not know, unless he bought some corn from the Harris boys and that he had some there, but the boys told him that he had taken it all up and thereupon the defendant turned and walked away with James Smith. In about ten or fifteen minutes they returned and he saw Harris go to where Qualls was working, and Smith went back to the engine. The defendant had a knife of some description in his right hand and his right hand was hanging down. The defendant went to talking to Qualls and had his right hand up close to Qualls' face. The defendant seemed to be out of humor; I could tell, they seemed to be quarreling. Qualls did not seem to be angry at first, but did appear so later on. When the defendant came up Qualls loosened the lever and it stopped, he could not hear what they said on account of the noise made by the saw. Qualls struck at Harris with his fist, then Harris threw his arm around him, and he could not see whether he was cutting him or not. Qualls seemed to

jerk loose and ran out past Harris and did not go but a little ways until he fell down; he was going tolerably pert and the defendant started after him and got to him pretty soon after he fell. When Qualls fell he seemed to strike on his left shoulder and turned on his back and got his foot up to keep Harris off and Harris caught one of Quall's feet. Then the witness went over and took hold of Harris's shoulder and told him to stop. Then Qualls got up and went off around the engine and the defendant walked off and stayed awhile; then he came back and asked witness if he did not see Qualls draw a hammer on him; witness told him he did not notice it. Witness did not see Qualls with anything in his hands. He thought the defendant struck him twice while they were standing and struck at him once as he went out. Then prosecuting witness was sent off to Aurora in a buggy. On cross-examination he detailed the particulars of the difficulty, in which he stated that Qualls struck at the defendant and then they clinched, defendant dodged and threw his arms around Qualls. This all occurred in the little space in which Qualls stood in handling the lever in controlling the saw; that after Harris struck Qualls twice with the hand that had the knife in it, Qualls started to run. He saw nothing in his hand, and did not see him pick up anything or attempt to pick up anything. On re-examination he stated he did not desire to be understood as saying that Qualls ever clinched the defendant; on the contrary he seemed to be trying to get away.

Charter Davis testified that he saw the defendant approach the prosecuting witness and saw them talking and saw the defendant shake his fist in Quall's face and the next thing he knew they clinched and defendant went to cutting Qualls with a knife. By clinching, he meant defendant threw his arms around Quall's neck. This witness could not see the knife, but saw the stroke of the hand in which defendant held the knife. Saw

him strike Qualls twice and Qualls shoved him back and ran out of the place and defendant after him. Qualls fell and the defendant ran up and caught him by the foot and was still motioning with his knife in the other hand. Saw Miller go up and separate them. He saw no provocation on the part of Qualls before the defendant struck him and stabbed him.

James Davis also testified that he saw the defendant going up to where Qualls was sawing and the latter was sawing a log, had just got it squared and was standing with his hand on the lever when the defendant came up and began to talk to him, but that on account of the noise he could not hear what was said. Saw defendant shaking his fist close to Qualls's face; after talking a little, he saw defendant throw his arm around Qualls's neck, the scuffle only lasted a minute and Qualls got loose and ran off; that the defendant followed him and Qualls fell and the defendant got him by the foot; Miller seemed to separate them. Defendant asked him if he did not see Qualls hit him the first lick, and he told him no, he did not see him hit him. Defendant said he wondered if Qualls thought he had broke even with him now.

The defendant testified in his own behalf that his son had told him that the prosecuting witness Qualls had short-changed him in paying him his wages on Saturday, and that Smith told him it was a fact, and thereupon he went back to get Qualls to pay it; when he got back he went up to where the prosecuting witness stood and said to him: "Joe, you are cutting away," and he said, "Yes," and I said, "How was it you broke even with the Harrises?" and he said "Oh! nothing," and I said: "If it was nothing you would not care to tell me," and he said: "It is none of your damn business," and he reached over and took up a hammer, and I said: "Leave that alone, you do not need that," then I told him it was my business to see that he paid my boy what

he owed him, and he said he did not owe him anything, and I said to him that the boy said he had counted him out of a dollar and then he said I was a G— d— liar, then I told him he was another one, and he squared himself, he turned facing me and drew back and struck square at my face, and I dropped my hand until he missed his lick and he clinched me around the neck and I reached around with my left hand, with my head down, trying to get hold of him and cut him with my knife to get him off of me, and as he threw his arm over I threw the knife up and it hung in his arm as he got loose of me. Then he walked off pretty pert four or five steps and turned and looked back and as he ran over to pick up a rock, he hit his foot on a post oak stump and fell over and commenced kicking at me and I caught him by the breeches leg with my left hand, and says, says I, ''Joe, have you got enough?'' and he said, ''Yes, sir, I have,'' and I says, ''Will you ever strike at me again?'' and he says ''No,'' and I says, ''Get up from there,'' and then Billy Miller came up and said, ''Quit fighting.'' The knife with which he cut Qualls was a little four-bladed knife. He was whittling with it when he commenced talking with Qualls. He cut him to get him off of him.

Defendant also offered evidence tending to show that the general reputation of Qualls as a peaceful, law-abiding man was not good. Other witnesses testified that Qualls had been a justice of the peace in his township and road commissioner and had also been a police officer in the city of Aurora. There was also evidence on the part of the State tending to show that the prosecuting witness's general reputation was that of a peaceable, law-abiding citizen.

Thereupon the court instructed the jury as follows:

''2. Gentlemen of the jury, the court instructs you that if you believe and find from the evidence, beyond

a reasonable doubt, that the defendant, John Harris, at the county of Lawrence and State of Missouri, on or about the 29th day of January, 1907, did wilfully, feloniously, on purpose and of his malice aforethought, cut, stab, strike and wound Joe Qualls with a knife, with intent then and there the said Qualls, on purpose and of his malice aforethought to kill, you will find the defendant guilty as he is charged in the information and assess his punishment at imprisonment in the penitentiary for a term not less than two years nor more than ten years.

"3. The court instructs the jury that he who uses upon another at some vital part a deadly weapon of any kind, must in the absence of qualifying facts be presumed to know that the effect is likely to produce death, and knowing this must be presumed to intend death, which is the probable and ordinary consequence of such an act, and if such deadly weapon is used without just cause, he must be presumed to do it wickedly or from a bad heart; if, therefore, the jury believe from the evidence in this case that the defendant wilfully, feloniously, on purpose and of his malice aforethought made an assault on the witness, Joe Qualls, as charged in the information, by cutting and stabbing said Qualls with a knife, in some vital part, with a manifest design to use such weapon upon him without sufficient reason, cause or extenuation, then it must be presumed that the defendant intended to kill said Qualls.

"4. The jury are instructed that a person who brings on a difficulty for the purpose of killing his adversary or wreaking his vengeance on him, cannot avail himself of the right of self-defense in order to shield himself of the consequences of wounding or injuring his adversary, however imminent the danger in which he may have found himself during the progress of the affray, and if in this case the jury believe from the evidence that the defendant prepared himself with a

knife previous to the difficulty with, or the wounding of, the witness, Joe Qualls, and sought, brought on, or voluntarily entered into the encounter with Qualls in order to wreak his malice on him, then there is no self-defense in the case.

"8.  Upon the question of self-defense interposed by the defendant in this case, you are instructed that if at the time the defendant cut the prosecuting witness, Qualls, if you find from the evidence he did cut him, defendant had reasonable cause to apprehend a design on the part of Qualls to take his life or do him some great personal injury, and that there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and to prevent such apprehended danger, he cut the said Qualls, and if at the time he did said cutting, he had a reasonable cause to believe and did believe that it was necessary for him to do such cutting to protect himself against such apprehended danger, you will acquit the defendant on the ground of self-defense.

"It is not necessary that the danger should have been actual or real, or that the danger should have been impending or about to fall, all that is necessary is, that the defendant had reasonable cause to believe and did believe those facts.  On the other hand, it is not enough that the defendant should have so believed; he must have had reasonable cause for such belief; whether or not he had reasonable cause for such belief is for you to determine under all the facts and circumstances given in the evidence; and if you believe from the evidence that the defendant did not have reasonable cause for such belief, you cannot acquit him on the ground of self defense."

In addition to these instructions the court also instructed the jury on the presumption of innocence, the credibility of the witnesses, and defined reasonable

doubt and the competency of the defendant as a witness, and the words, "Feloniously, wilfully and malice aforethought." To all of which instructions the defendant objected and saved his exceptions.

The defendant requested the court to give the following instruction:

"A. The court instructs the jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, John Harris, at the county of Lawrence and State of Missouri, on or about the 29th day of January, 1907, did unlawfully and feloniously make an assault upon one Joe Qualls, and did then and there unlawfully and feloniously cut, stab and wound said Qualls with a knife, with intent the said Qualls, feloniously and unlawfully to kill or do great bodily harm, you will find him guilty of an assault with intent to kill, and assess his punishment in the penitentiary for a term not less than two years nor more than five years, or imprisonment in the county jail not less than six months, nor more than twelve months, or at both a fine not less than one hundred dollars and imprisonment in the county jail not less than three months nor more than twelve months, or at a fine not less than one hundred dollars."

Which instruction the court refused and the defendant excepted. The jury having found defendant guilty, within four days he filed his motion for new trial, which was heard and overruled, to which he saved his exceptions. Defendant also filed a motion in arrest of judgment which was heard and overruled and his exceptions noted.

I. The information is sufficient and the record proper otherwise appears free from error.

Both the third and fourth instructions are challenged by the defendant for the reason that the court in each assumed as a fact that the knife with which the defendant stabbed the prosecuting witness, was a dead-

ly weapon.  The statute under which this information was drawn, section 1847, Revised Statutes 1899, provides: "Every person who shall, on purpose and of malice aforethought, shoot at or stab another, or assault or beat another with a deadly weapon, or by any other means or force likely to produce death or great bodily harm, with intent to kill, maim, ravish or rob such person, or in the attempt to commit any burglary or other felony, or in resisting the execution of legal process, shall be punished by imprisonment in the penitentiary not exceeding ten years."  In State v. Keele, 105 Mo. 38, it was held that a felonious stabbing of another with intent to kill, constituted one offense under said section, and it was not necessary when the assault had been made with a certain knife to charge that said knife was a deadly weapon, as the statute was as to that offense silent as to the character of the weapon used. In State v. Laycock, 141 Mo. 278, 279, the assault was alleged to have been committed feloniously, on purpose and with malice aforethought, with knives the length of the blade of which was four inches, etc., but it was not alleged that said knife was a deadly weapon and this court following State v. Keele, supra, held that it was not necessary to allege that the knife was a deadly weapon under this section of the statute.  In State v. Bond, 191 Mo. 555, l. c. 568, this same distinction is maintained between that clause in the statute which makes the shooting at or stabbing another one offense, and an assault with a deadly weapon, another and distinct offense.  See also State v. Webster, 77 Mo. 566; State v. Painter, 67 Mo. 84; State v. Wood, 124 Mo. 412; State v. Hoffman, 78 Mo. 256.  In State v. Spaugh, 199 Mo. 147, it is ruled that in an information under section 1848, Revised Statutes 1899, the words, "on purpose" and "a deadly weapon," were surplusage and unnecessary.

In view of this long line of decisions, it must be

held that the insertion of the words "with a deadly weapon," as descriptive of the knife with which the stabbing was done, was an unnecessary allegation, and the information would have been sufficient without it, but having alleged it, the question arises, could the court in its instructions ignore it as redundant and unnecessary to be proved?

Unquestionably it is the accepted rule in criminal practice that if a necessary allegation is made unnecessarily minute in description, the proof must satisfy the descriptive as well as the main part, since the one is essential to the identity of the other. [1 Bishop's New Criminal Proc., sec. 485; State v. Samuels, 144 Mo. 68.] In this last-mentioned case, the indictment charged the felonious uttering of a forged check "with intent him, the said Walter Robinson, then and thereby feloniously to injure and defraud." It was ruled that while our statute provided that it was sufficient to allege that the defendant did the act with intent to defraud without alleging the intent to defraud any particular person, yet, inasmuch as the pleader had unnecessarily charged the intent to defraud a particular person, to-wit, Walter Robinson, it became descriptive of an intent to defraud Robinson and no one else, and as the proof failed to show any intent to cheat Robinson there was a failure of proof, and the judgment was reversed. In that case it is to be observed that it was an essential averment to charge an intent to cheat and defraud generally, and when the pleader went further and specified the intent to defraud a particular person, he had made the necessary allegation unnecessarily minute, and he was therefore held to prove the offense as alleged. But in State v. Sakowski, 191 Mo. 635, the indictment was for receiving stolen goods knowing them to have been stolen and the pleader without stopping at the allegation that the defendant feloniously received the stolen goods, knowing them to have been stolen, added "from

the St. Louis & San Francisco Railroad Company,''
and the contention was that the judgment must be re-
versed because the circuit court refused to instruct the
jury that before they could convict the defendant they
must find and believe that the defendant not only knew
that the property was stolen, but that he knew that
the property was stolen from the said railroad com-
pany. And this court, while recognizing the rule an-
nounced in State v. Samuels and by Bishop as above
quoted, drew the distinction between allegations that
were necessary which were made unnecessarily specific,
and allegations which were merely superfluous and im-
material, and cited 1 Chitty's Crim. Law, page 173,
wherein it is laid down that, ''Though the indictment
must in all respects be certain, yet the introduction of
averments although superfluous and immaterial will
seldom prejudice. For if the indictment can be sup-
ported without the words which are bad, they may on
arrest of judgment be rejected as surplusage;'' and
quoted from the same learned author, in the same vol-
ume, page 250: ''It is a general rule, which runs
through the whole criminal law, that it is sufficient to
prove so much of the indictment as shows the defend-
ant has committed a substantive crime therein speci-
fied; and in the case of redundant allegations it is suffi-
cient to prove part of what is alleged according to its
legal effect, provided that that which is alleged,
but not proved, be neither essential to the charge,
nor describe or limit that which is essential.'' And it
was held in that case that it was neither essential nor
necessary to charge that the defendant knew that the
stolen goods were the property of any particular per-
son, but the offense was complete if the defendant knew
the property was stolen when he received it. It mat-
tered not from whom it was stolen and it was not nec-
essary that the State should prove that he knew it
was stolen from the particular railroad company, citing

Rex v. Jervis, 6 C. & P. 156; People v. Caswell, 21 Wend. 86; 2 East, P. C. 780, sec. 163; Clark's Crim. Proc., 332; Com. v. Squire, 42 Mass. 1. c. 260, 261; United States v. Howard, 3 Sumner, 12; Anderson v. State, 38 Fla. 3; State v. Smith, 37 Mo. 1. c. 64.

As we have seen that the uniform construction placed by this court upon the first clause of section 1847 has been that it is not necessary to allege that the instrument with which the defendant stabs another is a deadly weapon, the allegation that the knife with which the defendant in this case stabbed the prosecuting witness was a deadly weapon was unnecessary and can be treated as surplusage, and it was not essential to prove that it was a deadly weapon to sustain the charge in the information, and therefore, it was not necessary for the court to submit to the jury the question whether such knife was or was not a deadly weapon, and hence, the second instruction was entirely sufficient without requiring the jury to find that the knife with which the defendant stabbed Qualls was a deadly weapon, as the fact whether it was a deadly weapon or not, was wholly unnecessary and immaterial.

But notwithstanding the fact that it was unnecessary to charge that the knife was a deadly weapon, or to prove that it was, if the defendant on purpose and of his malice aforethought did assault and stab the prosecuting witness therewith with intent to kill him, does it follow that the third instruction was correct in view of the evidence in the case? By reference to the said instruction it will be observed that the court invoked the presumption of law which arises from the intentional use of a deadly weapon by one person upon another at some vital point, to-wit, that he must be presumed to have intended death, which is the probable and ordinary consequence of such an act, and that if such deadly weapon is used without just cause, he is presumed to have done it wickedly and from a bad

heart, that is to say, malice may be inferred, and in applying this presumption of law to the facts in this case, the court manifestly assumed the knife used by the defendant upon the prosecuting witness was a deadly weapon, without leaving it to the jury to find whether such knife was in fact a deadly weapon, before indulging the presumption arising from its use upon the prosecuting witness. The only evidence as to the character of the knife was from the defendant himself, who says that it was a little four-bladed pocket knife, and which he carried as a pocket knife, and the depth of the wound which he inflicted with it; the wound being nearly two inches deep in the side of the prosecuting witness and reaching nearly to the cavity. In State v. Bowles, 146 Mo. l. c. 13, it was said: "A deadly weapon is any weapon or instrument by which death would likely be produced, when used in the manner in which it may appear it was used in the affray. . . . . It does not follow that because no witness testified to seeing the knife, or detailed its exact dimensions, there was no proof as to its dangerous or deadly character. The deadly effect it produced was confirmation strong of its lethal qualities." In that case, the deceased had been cut in the right groin, the wound had been inflicted by a sharp instrument. It cut through two parts ligament, severed the illiac artery, and cut through the peritoneum. The physicians testified that the wound was in a vital part and was necessarily fatal. It was ruled that it needed no argument to prove that a knife, capable of inflicting a wound of the dimensions and depth shown in that record, and in the vital part of a grown man, was such a weapon as the law denominated deadly. But in this case from the description given by the defendant of the knife and the fact that the wound in the side did not reach the cavity, which the doctor says was about two inches from the surface of the body, we do not think it could be assumed as a

matter of law that this knife was a deadly weapon, but the fact whether it was or was not should have been submitted to the jury by the court as the predicate of the presumption which the court invoked for the purpose of allowing the jury to infer a felonious intent to kill the prosecuting witness. From this instruction we think the jury were bound to find that the knife was a deadly weapon and that it was erroneous on the part of the court to have assumed that it was such. [State v. Weeden, 133 Mo. l. c. 75, 83; State v. Grant, 152 Mo. 57.]

II. The 4th instruction is assailed on the ground that it in effect told the jury that the possession of this pocket knife by the defendant was a circumstance which would warrant them in denying him the benefit of the law of self-defense, when in truth the possession of such a knife by the defendant or any other citizen is an act in and of itself of an innocent and harmless nature. But we think the criticism of this instruction is without merit when considered in connection with the testimony in the case, which at least tended to show that the defendant sought and brought on the difficulty with the prosecuting witness and had his knife in his hand and without provocation began at once to stab him with his knife. This was left for the jury to find as a fact, and if true went far to demonstrate that the defendant was not acting in self-defense in cutting and stabbing the prosecuting witness as he did.

III. Error is also assigned in the refusal of the court to instruct the jury as asked by the defendant in his instruction designated in the record as "A," and which prayed the court to instruct the jury that even though the defendant did unlawfully and feloniously assault the prosecuting witness and cut and stab him with a knife with intent to kill him or do him some great bodily harm, they might find him guilty of

an assault with intent to kill him without malice afore-thought. In view of all the evidence in the case we are of the opinion that the court should have given this instruction and have left it to the jury to say whether the assault was done with malice aforethought or with intent to kill or do some great bodily harm without malice aforethought. Section 2370, Revised Statutes 1899, expressly provides that upon an indictment for an assault with intent to commit a felony or for a felonious assault, the defendant may be convicted of a less offense. [State v. Grant, 144 Mo. l. c. 67.]

IV. Finally it is submitted that the circuit court improperly excluded the questions of the defendant on the cross-examination of the witnesses Rinker, Garrison and Thurman. These witnesses had been called by the State in rebuttal of testimony offered on the part of the defendant to prove that the prosecuting witness had the general reputation of being a quarrelsome man, and they testified that his reputation was good for being a peaceable and quiet citizen. On cross-examination counsel for the defendant inquired of the witness Rinker if he had ever heard about a boy by the name of Grover Berry doing some work for the prosecuting witness for seventy-five cents, and going into a saloon and asking him for the amount, and that the prosecuting witness knocked him down with a glass of beer? Which question the court excluded and the defendant excepted. Counsel for the defendant then asked him if he had ever heard of the prosecuting witness going up behind a stranger, while he was on the police force one time, and striking him, which question the court also excluded. Counsel for the defendant then made an offer to prove that the prosecuting witness walked up behind a stranger that got off the train at Aurora and hit him on the head with his pistol and knocked him down, and when asked why he did it, said he looked like a man he had heard was wanted some-

where. This was also excluded, and the defendant saved
his exceptions to the exclusion of all these questions
and answers. No question seemed to have been ex-
cluded on the cross-examination of the witness Garri-
son. On cross-examination the counsel for defendant
repeated the same question to the witness Thurman in
regard to the Berry boy and as to the prosecuting wit-
ness striking him on the head and knocking him down,
and also as to the prosecuting witness stepping up be-
hind a stranger and knocking him down. These ques-
tions were excluded and the defendant excepted.

In State v. Crow, 107 Mo. l. c. 347, it was said by
this court: "Reputation, itself, can only be known from
hearsay information and the courts give great latitude
in cross-examination upon that question. 'The real
purpose (says Judge Cooley in Annis v. People, 13
Mich. 511) of this cross-examination is to enable the
court and the jury to determine whether the impeach-
ing witness in fact knows the general reputation of the
other, and if so, whether he testifies truthfully in re-
gard to it.' [1 Greenleaf, Evidence, sec. 461; State v.
Miller, 71 Mo. 90; State v. Beal, 68 Ind. 345.] The ob-
jections that are urged against the admissibility of this
cross-examination to the extent it was carried, namely,
that it is oppressive to a defendant to have accusa-
tions brought against him founded alone on rumors,
and which he had no opportunity to defend, and that it
multiplies collateral issues, we do not think well ta-
ken." The conclusion was reached in that case that a
defendant himself and his witnesses were subject to
legitimate cross-examination though other independent
crimes were thereby disclosed.

In State v. Miller, 71 Mo. l. c. 90, 91, it was said:
"When a witness is called to impeach another by proof
of general character, a liberal cross-examination touch-
ing his means of knowledge should be allowed, and au-
thorities of the highest respectability go to the extent

of saying that on such cross-examination it is permissible to inquire of the witness the name of the person whom he has heard speak against the reputation of the witness sought to be impeached, and it may turn out that all the persons from whom he has heard unfavorable reports are personal enemies and sustain such relations to the witness or party whose character is the subject of assailment that but little if any importance should be attached to what they may have said."

In State v. McLaughlin, 149 Mo. l. c. 33, it was said: "It is settled law that when a witness is called to sustain or attack the reputation of another witness, the opposite party may cross-examine him liberally as to his means of knowledge, and test his own truthfulness, and it is largely a matter of discretion with the court how far such an examination shall be allowed. We think it would be an unwise exercise of our appellate jurisdiction to reverse a cause on this showing alone. [State v. Crow, 107 Mo. 341.]"

In view of the fact that the defendant had called other witnesses, who had testified that the reputation of the prosecuting witness for quarrelsomeness was bad, if this were the only ground for reversal, we would not hesitate to affirm the judgment. While the authorities cited concur in holding that a liberal cross-examination should be allowed, they also hold that the extent to which it may go is largely in the discretion of the trial court. In view of all the evidence in the case we are of the opinion that the exclusion of the answers and questions propounded to Rinker and Thurman on the cross-examination, was not error and worked no prejudice to the defendant.

For the error in the instruction number three already noted, and the refusal of the court to give the instruction designated as "A," the judgment is reversed and the cause remanded for new trial.

*Fox, P. J.,* and *Burgess, J.,* concur.