# THE STATE v. WILLIAM KEBLER, Appellant.

### Division Two, May 26, 1910.

1. **INFORMATION: Concubinage.** An information charging that defendant took away from her father a female under eighteen years of age for purposes of prostitution and concubinage, is not defective because it fails to charge she "was so taken away without the consent and against the will of her father." The statute (R. S. 1899, sec. 1842) does not so require.

2. **CROSS-EXAMINATION: Concubinage..** It was proper to ask a witness for the State in a concubinage case, "Did you advise Rettie to go up to see her sister?" who was living with the defendant. But where the record discloses that substantially the same question had previously been fully answered by the same witness, the exclusion of the question is not reversible error.

3. **———: Unfriendly Witness.** Where a witness for the State in a felony prosecution unexpectedly proves hostile in his testimony, it is not error to permit the prosecuting attorney to ask him questions refreshing his memory, in the nature of cross-examination.

4. **INSTRUCTION: Concubinage: Consent of Parent.** An instruction in a concubinage case is not faulty because it does not require the jury to find that the defendant took her from her father's custody "without his consent or against his will." It is not essential under the statute, to charge that the taking away was against the father's will or without his consent, and it being unnecessary to charge it, if it is not charged, it is unnecessary either to instruct or prove that the taking away was without the father's consent.

5. **———: Circumstantial Evidence.** Where the court has given a full, fair and correct instruction on circumstantial evidence, it is not error to refuse one on the same subject offered by defendant; but if it is argumentative or otherwise faulty, it is proper to refuse it.

6. **SUFFICIENT EVIDENCE: Concubinage.** The evidence in this case amply supports the verdict that defendant took from her father's custody, for purposes of concubinage, a girl under eighteen years of age. It was for the jury to solve the conflicts in the testimony, and there being substantial evidence of defendant's guilt the Supreme Court will not hold it insufficient to support a conviction.

State v. Kebler.

Appeal from Benton Circuit Court.—*Hon. C. A. Denton,* Judge.

AFFIRMED.

*C. C. Barrett* for appellant.

(1)  (a)  It was reversible error to permit the prosecuting attorney to lead, cross-examine, discredit and impeach witness for the State, over the objections of the defendant, by evidence previously made, unless he was entrapped or misled by some artifice or by some statement made to him by some one on whom he had a right to rely.  State v. Burks, 132 Mo. 363.  (b)  The prosecuting attorney should not have been permitted to ask Alice Shackleford, witness for the State, over the objections of the defendant , ''Go ahead and tell the jury just like you did on the witness stand before, all the facts in the case, Alice, if you can?''  ''I will ask you this: didn't you testify at the preliminary that you were surprised when she came in the house and that you didn't know that she was coming?''  ''Why didn't you testify to that before the justice at the preliminary hearing?''  ''Tell the jury whether you did or not complain about that?  Will you tell them the facts; that's all we want.''  ''Didn't you testify at the preliminary examination that they would frequently go out and stay out late at night?''  ''When did you change your mind about this prosecution, Alice?''  There was nothing to show that this witness had ever testified at a preliminary trial contrary to her evidence at the trial, and the prosecuting attorney made no offer to show that she had ever told him that she would testify as he desired her to do, nor did he name any other person to whom she stated that she would testify as his mode of examination indicated that he expected her to do.  Neither by affidavit or otherwise was any showing made of surprise, nor was there any evidence to indicate that she had changed her mind about this

prosecution. Dunn v. Dunnmaker, 87 Mo. 597; State v. Burks, 132 Mo. 363. (2) The court erred in not permitting defendant to show by cross-examination of witness for the State, what induced Rettie to go off with the defendant, as tending to disprove wrong intent of defendant, since the gravamen of charge of the indictment is the felonious taking of Rettie from her father for the purpose of concubinage with the defendant. Therefore, since not a single act of illicit intercourse was proved to have occurred between these parties, the defendant should have been allowed to show the cause of her going away from home with the defendant, and whether the defendant persuaded or decoyed her into going with him, or whether she went of her own motion and at the solicitation of her sister, Mrs. Ed Dickey. State v. Johnson, 115 Mo. 480; State v. Gibson, 108 Mo. 575.

*Elliott W. Major*, Attorney-General, and *John M. Dawson*, Assistant Attorney-General, for the State.

(1) The information is sufficient, valid, properly verified and in approved form. R. S. 1899, sec. 1842; State v. Johnson, 115 Mo. 486; State v. Jones, 191 Mo. 655; State v. Knost, 207 Mo. 18; State v. Beverley, 201 Mo. 550; State v. Fleetwood, 223 Mo. 69. (2) The prosecuting attorney asked the witness, Alice Shackleford, who was the housekeeper of defendant, if she had not testified to a certain state of facts on the preliminary hearing different from what she had testified to at the trial in the circuit court, and that during the interval between the preliminary and the trial of the circuit court she had become hostile to the prosecution, was an unwilling witness and caused surprise to the prosecution. The prosecutor, therefore, had a right to ask her if she had not testified differently at the preliminary. Brown v. Wood, 19 Mo. 475. This wit-

ness had testified in the preliminary trial, and the prosecutor was entrapped by the witness. 1 Greenleaf on Evidence, sec. 444; 17 and 18 Victoria, chap. 125, sec. 22.

FOX, J.—The defendant has brought this cause to the Supreme Court by appeal from a judgment of conviction in the circuit court of Benton county, Missouri, for a violation of the provisions of section 1842, Revised Statutes of 1899. That section provides that "every person who shall take away any female under the age of eighteen years from her father, mother, guardian or other person having the legal charge of her person, either for the purpose of prostitution or concubinage, and any father, mother, guardian or other person, having the legal charge of her person, who shall consent to the same, shall upon conviction thereof, be punished by imprisonment in the penitentiary not exceeding five years."

The information in this case, which was filed on the 12th day of July, 1909, by the prosecuting attorney of Benton county, duly verified, charged defendant substantially with the taking of Rettie Smith, a female under the age of eighteen years, that is, of the age of fifteen years, from the custody of her father, J. H. Smith, who had the legal charge of the said Rettie Smith.

At the regular July term of the circuit court of Benton county this cause was set for trial on August 12, 1909, and on said last above named date the State and the defendant announced ready for trial; the defendant was duly arraigned in open court and entered his plea of not guilty and the trial proceeded. Upon such trial the State introduced evidence tending to show that defendant, William Kebler, about the time it is alleged the offense was committed, lived in Cooper county, Missouri, about six miles south of Boonville; that he was known sometimes as Williams and some-

times as Kebler; that during some six or seven years previous to the time of the offense charged, defendant had been living with Alice Shackleford, who was an older sister of Rettie Smith, as his housekeeper; that defendant and said Alice Shackleford were never married, but two or three children were born to them during the time that the said Alice Shackleford was his housekeeper; that in September, 1907, defendant came to the town of Warsaw in Benton county, from his home in Cooper county, and induced, coaxed and persuaded Rettie Smith to leave her father's house and return to defendant's home in Cooper county with him. He arranged for her to put on two waists and several skirts so that she would not have any baggage when she left her father's house, and she met him at the depot when the train came and departed with him for his home. He also undertook to arrange with Edward Dickey, who resided in Warsaw, to take Rettie Smith to the town of Schuyler and have her get on the train at that point if her father should go to the depot at Warsaw and prevent Rettie from taking the train with him. Defendant's object, as he said, in taking Rettie to his home in Cooper county, was that she was a poor girl and did not have clothes like other girls; that she could get work at good wages in his neighborhood, but the true cause was for the purposes of concubinage. Defendant and Rettie Smith, on arriving at Boonville at about ten o'clock at night, walked out to defendant's home. Upon their arrival defendant remarked, "I am a wildcat when I take a notion to be. I stealed away two of the old man's girls, and I'll steal away another one if I get half a chance."

Defendant was a laborer and worked in his neighborhood cutting corn, cord wood, clearing land and fishing. After the arrival of Rettie Smith at his house she was his constant companion and helped him with his work and accompanied him in his boat up the river at all times of the day and night, and went with him to

the market where he sold his fish. Defendant moved about from place to place, living nearly all the time in a tent on the river bank; on retiring at night defendant would spend part of the time with Rettie Smith and a part of the time with the Shakleford woman. In November, 1908, defendant said to witness, Blanche Dickey, in speaking of Rettie Smith's condition, she being *enceinte*: ''Well, I know the very time she got this way, and I am going to stand by her as long as there is a drop of blood in my veins.''

In October, 1908, Alice Shackleford and her children returned to Warsaw, leaving Rettie with defendant and his son, Walter Kebler, a boy twelve years old, living together in a tent on the river in Cole county.

The State's evidence further tended to show that Rettie Smith was born December 3, 1891; that her mother died in 1905; her father, J. H. Smith, died in 1908; that Robert Lincoln Smith, a brother of Rettie Smith, was living at the defendant's home in 1907, and at the time defendant and Rettie Smith arrived there he was employed in cutting corn, and defendant assisted him; that defendant would have Rettie Smith with him all the time; that Robert Smith complained about it and wanted Rettie to leave there and go to a neighbor's to work; that he, defendant, objected, saying he would see that Rettie had a home as long as he lived; that she was not going to work out; that Robert Smith remained in defendant's home until October, 1907, when he went to Warsaw and there remained until the 30th day of May, 1908, when he returned to defendant's home and found there defendant, Alice Shackleford, Rettie Smith and the children all living together. Robert Smith remained at defendant's home through June and July, 1908; that defendant's occupation during that time was fishing and that Rettie was on the river with him all the time.

The evidence of Alice Shackleford tended to show that she had known defendant for six years; that she kept house for him six years in Cooper county; that she was the mother of four children, and that at the time she commenced housekeeping for defendant she was the mother of only one child; that while she was his housekeeper defendant went to Warsaw in September, 1907, to pay off a debt for her father, and that when he came back her sister, Rettie Smith, was with him; that she didn't know whether or not her sister was to come back with him; that she had written for her to come about a week before that. Her sister then lived with them; they all worked, and that when she didn't have work for her sister to do in the house she went out and helped defendant cut wood and such like work; that she didn't object to her sister doing that kind of work, for whenever witness didn't go along to help in the work, the boy Walter went, and that when they lived down on the river "we fished there for a living, and of course, there was sometimes when she would go with Mr. Kebler to town. Lots of times they wouldn't get back until late." That she tried to keep her from going out with him, only when some one was with her, and that Rettie would then get mad and go off on the river by herself and be gone half a day at a time, and defendant and witness had some trouble about it. "He told me just to leave her alone, that may be we could talk to her and get her reconciled down and to do more what was right and obey when we wanted her to do anything." That she testified at the preliminary trial that when she and defendant were going down the river in a boat that he said if she, Rettie, laid that child on him he would kill her and the whole Smith family; that they lived on the Alexander place, seven miles south of Boonville, when Rettie came to live with them, but only lived there two days after she arrived. They moved from there to Mrs. Castleman's up by Lamine, in a big, three roomed

house; that they had four beds in the house; that the house they moved from only had two rooms; that defendant would not let Rettie receive attentions from young men because she was too young. "We moved from Castleman's place over into Howard county and then to Benton county. We got on the train at Henley, in Cole county, Rettie and I and the children and we came out to Cole Camp; I came on to Warsaw and Rettie stayed at Cole Camp so far as I know. The next time I saw Rettie was two weeks afterwards here in Warsaw. She was by herself. She came into the depot and went home with me. My home was in a tent on Gallagher and Calvert's place over close to the springs. She was in very bad condition, afterwards gave birth to a child. Defendant said if I did not stay by her bed while she gave birth to that child that I would not be a sister to her and would not do a sister's duty, and I stayed by her bed and helped her through her sickness."

This witness stated on cross-examination that defendant and Rettie when out together working or fishing on the river were nearly all the time in sight of the house; that you could see for three or four miles either way; that she advised Rettie not to go out at night with anyone; that at times Rettie would go to a neighbor's house where there were young men and young girls and be gone pretty near a half a day at a time; that at times defendant and witness had left Rettie at home alone and on returning often found men and boys with her.

The defendant offered evidence tending to show that Rettie Smith resided at Warsaw with her father three or four years; that defendant came to Warsaw to pay off a mortgage for Rettie's father and that Alice had been writing Rettie to come out where she lived, and that Blanche Dickey had also urged her to go, and that morning after breakfast Rettie said to the defendant, "Will, if I had the money I'd go home with you,".

to which defendant replied: "If your pa is with you and has no objections, I well lend you the money and you can go with me." That she told him all right and went with defendant to ask Blanche Dickey what she thought about it, and that Blanche went with her to the depot and helped her on the train, and that she, Rettie, was the first one to speak about going; that she wanted to go to where her sister Alice was; that the defendant and herself had not at any time had any immoral relations; that defendant is not the father of her child; that about three months before the trial she was staying with her folks in Warsaw; that she was being mistreated by them and that she wrote defendant asking him to secure her a place to work; that she wanted to get away from Warsaw; that the defendant came to Warsaw and that she went down the river with him; that she helped defendant with his work, cut wood and fished; that Rettie was 17 years old at the time of the trial; that she left Warsaw on December 20, 1907, with defendant, on the train, and that when they arrived at defendant's home Alice was greatly surprised at her coming; her brother Bob was there at the time; that they arrived at Boonville about 10 o'clock at night and walked out to defendant's home, arriving there between 12 and 1 o'clock; that the reason Rettie did not take her clothes with her was that she didn't have time to get them, but that she had on two waists and two skirts; that her father knew she was going away and when she left he was sitting with his feet up against the window whistling; that the money loaned her by defendant to pay her fare was paid back by her in helping him cut wood and corn; that they lived on Wendleton's place, from there they moved to Lamine, on Mrs. Castleman's place; then moved over by the river and worked for Mr. Hamilton from February until March; they lived there until the water got up and then moved to Miller's place and from there to Baird's place across the river, coming down the

river then to Henley and from there to Warsaw by train; that Rettie Smith stopped at Cole Camp, where she worked for Mrs. Hamler; this was in November; that her child was born March 7, 1909; that defendant came to Warsaw three or four months before the trial and took Rettie and her baby away in a boat; that the reason she went with defendant was "because her folks talked rough and dogged her into everything."

The defendant testifying in his own behalf stated that his name was W. C. Kebler, but that he was sometimes called Williams; that he was thirty-seven years old; that when a small boy he was placed with a family named Williams, and that he did not know his real name until he reached the age of seventeen years; that he resided in Cooper county during the year 1908; that he went to Warsaw, and that James Smith was in hard luck, had his team mortgaged and had written him to come and pay off the mortgage, which he did, arriving at Warsaw about 2 o'clock in the morning, and spending the night at the home of Mr. Smith; that at the breakfast table Rettie said: "If I had the money I'd go home with you; sister Blanche and Alice both urge me to go; Alice wrote to me and Blanche urges me and her man, Ed, urges me to go," to which defendant replied: "Well, Rettie, if you want to go I'll let you have the money to go if your pa has no objections," and that her father said, "I don't care what she does; I don't care where she goes." Rettie went home with defendant and stayed with them all the time. "After I got home I went out with a threshing machine that fall and threshed a while, and Rettie stayed with Alice. Bob Smith was there cutting corn, and when I came back from threshing I went to cutting corn with Bob. Rettie would come out in the field and Alice would come out in the field and bring us water, and there was two other gentlemen there sawing wood. Sometimes Rettie would take the corn knife and cut three or four stalks just to bother us; she wanted to

and did go out with me to chop wood, about fifty or seventy-five yards from the tent; sometimes Rettie would go with me fishing, she and I alone, but not often; she never went fishing with me alone out of sight of the house; I never had any immoral relations with Rettie Smith; she wrote me when I was at Osage Bluff; I think the letter is down among my stuff; I took her from Warsaw about three or four months ago and tried to get her work at three different places along the Osage river; Rettie took the chills, and I stopped and put up the tent; I never was out after dark with the girl in my life, only the time I took her home with me. When I would be away from home and go back I would find young men there, among whom were Emmet Hamilton, True Miller and Frank McClain. This would be when Alice and I would be away, we would find them there nearly every time we went back. I told Mrs. Dickey I would stand by Rettie as long as ever I could stand by her because everybody else was kicking her out and driving her down, but there was nothing said about the father of the child that I know of. Ed Dickey said to me, 'I am going to choke her and make her tell;' I said, 'Ed, that is the last thing ever you do; for God's sake don't do it, the law will handle you.' I said that if Ed Dickey ever choked the girl he would have me to choke. I told Blanche Dickey I didn't know what the girl had meant by acting this way. One day when I was over at Blanche's, I said, 'Blanche, I don't see what in the world ever possessed Rettie to act this way,' and she said, 'Well, I don't know.' The night Rettie and I arrived at my house Alice jumped out of bed and ran and grabbed her and said, 'Oh, here is my sister, I thought it was Blanche, I was looking for Ed to step in,' and she hugged and kissed Rettie and sat and talked until near daylight. I never said anything about being a wildcat. While Rettie was living with us on the river she would go away and be gone a half day at a time; I don't know where she went, didn't pay

much attention to her; I never objected to her getting a job but once; her sister was sick that morning and I had nobody to cook for me, and I said, 'Rettie, you don't need to go over there to wash.' She was going away to wash; I was married about 13 years ago at Elko, Wisconsin, my wife is dead; I have no wife at this time. While on the train with Rettie from Warsaw I was not paying any special attention to Rettie, nor was she to me, more than I was watching her to keep her from losing her hat; she kept sticking her head out of the window all the time. Ed Dickey and myself, had a little trouble once. He and Charles Smith and myself got a little whiskey and started home, and one of them struck me on the head; I claimed it was either a pair of knucks or a little billy; I recollect that evening Ed Dickey and myself were sitting there playing pitch, and he says to me, 'Bill, I and Jim is at outs; Rettie would like to go home with you, and if you will pay her way I will get her brother Floyd to take Jim Smith to Fairfield in his buggy and I will take Rettie to Schuyler, and she will get on the train there and you get on here.' "

In rebuttal the State offered evidence tending to show that defendant said it didn't make any difference what the outcome of this trouble was, he loved Rettie and that he was going to marry her; and that he and Alice were not married; that in the summer of 1909, defendant left his son, Walter, in a tent at Osage Bluff, twelve miles from Jefferson City, in Cole county, and went to Warsaw to get Rettie and her baby and was gone several days; that on his return they remained in the tent two days, going then by boat to Chamois; left Osage Bluff in the afternoon and camped that night on an island in the Missouri river; got to Chamois the next morning at ten o'clock, and defendant was pitching his tent when arrested.

At the close of the evidence the court instructed the jury upon all subjects to which the testimony was

applicable. We deem it unnecessary to reproduce the instructions as given, but will give them such attention as they require during the course of the opinion. The cause was submitted to the jury upon the evidence as introduced upon the trial and the instructions of the court and they returned a verdict finding the defendant guilty as charged in the information and assessed his punishment at four years' imprisonment in the penitentiary. Timely motions for a new trial and in arrest of judgment were filed and by the court taken up and overruled. Sentence and judgment were entered of record in conformity to the verdict and from this judgment the defendant prosecuted this appeal and the record is now before us for consideration.

## OPINION.

Learned counsel for appellant challenges the sufficiency of the information in this cause. This insistence is directed to the failure of the prosecuting attorney to charge in the information that Rettie Smith, the female charged to have been taken from her father, J. H. Smith, "was so taken away without the consent and against the will of her father, J. H. Smith."

Section 1842, Revised Statutes 1899, upon which this information is predicated, provides that "every person who shall take away any female under the age of eighteen years from her father, mother, guardian or other person having legal charge of her person, either for the purpose of prostitution or concubinage, and any father, mother, guardian or other person, having the legal charge of her person, who shall consent to the same, shall, upon conviction thereof, be punished by imprisonment in the penitentiary not exceeding five years."

It will be observed that section 1842 is subdivided; the first subdivision is directed to any person who shall take away any female under the age of eighteen years

from her father, mother, guardian or other person having legal charge of her person, for the purpose of prostitution or concubinage. The second subdivision is directed to the father, mother, guardian or other person having the legal charge of the person of such female, and provides that if they shall consent to the taking away as provided for in the first subdivision, they shall be guilty of a felony.

The charge against the defendant in the case at bar is predicated upon the first subdivision of this statute and charges the offense in the language of the statute, that is, that the defendant did feloniously and unlawfully take away Rettie Smith, a female under the age of eighteen years, from one J. H. Smith, her father, he, the said J. H. Smith, then and there having the legal charge of the person of her, the said Rettie Smith, for the purpose of concubinage, etc.

While a number of the cases to which our attention has been directed by the learned Attorney-General embrace in the charge in the information that the female under the age of eighteen years was taken away from her father without his consent and against his will, yet in our opinion that allegation is not essential to the validity of the information.

As heretofore indicated we have pointed out the two subdivisions of section 1842, and that the offense with which the defendant in the case at bar is charged is embraced entirely within the first subdivision. The offense with which the defendant is charged is substantially in the language of the statute, that is, that he unlawfully and feloniously took the female from her father who had the legal charge of her, for the purpose of concubinage; and this, under the repeated rulings of this court, is all that is necessary to constitute a valid charge of a crime defined by the statute. As heretofore pointed out, if the father having charge of a female under the age of eighteen years, should consent to her being taken away for the purpose of prosti-

tution or concubinage, he would be guilty of a felony, and manifestly the law does not contemplate that an information or indictment, in charging an offense against a person for taking away a female from her father, should make allegations which would negative the fact that the father had committed any offense under the second subdivision of the statute. In our opinion the allegation as contended for by the appellant is not essential to the validity of the information in the case at bar.

## II.

Numerous complaints are directed to the action of the trial court upon the subject of the admission of incompetent evidence and the exclusion of competent evidence during the progress of the trial. Upon this proposition our attention is directed to the cross-examination of Mrs. Dickey, a witness for the State, by counsel for defendant. This witness, during the progress of her examination in chief, had detailed fully her knowledge of the manner in which Rettie Smith was taken away by the defendant, and upon cross-examination one of the questions propounded to Mrs. Dickey by counsel for defendant was, "Did you advise Rettie to go up to see her sister?" To this question there was an objection interposed by the State, which was sustained by the court. Clearly this was proper cross-examination, and but for the disclosures of the record, which shows substantially that same question had been fully answered by Mrs. Dickey in response to another question it would perhaps invite some serious consideration, but upon an examination of the record we find that counsel for defendant upon cross-examination had made full inquiry of Mrs. Dickey, this same witness, as to the receipt of letters by Rettie Smith from her sister, and also inquired as to whether or not this witness had not told Rettie she ought to go up there, and the witness emphatically replied, "No, sir, I did not

tell her.'' Under that condition of the record we are unable to see any harm that could result from the limitation placed upon the cross-examination of Mrs. Dickey concerning her advice to Rettie to go up and see her sister. She had substantially answered the same question propounded by defendant's counsel in which she said that she had not told her, or in other words, had not advised her to go up to see her sister.

Another objection is made to questions propounded by the prosecuting attorney in the nature of a cross-examination of Alice Shackleford, a witness who had been introduced by the State. It is sufficient to say upon this proposition that the record discloses that the State did introduce Alice Shackleford as a witness, and during the progress of her testimony the State doubtless discovered that she was not as friendly to the State as she was supposed to have been by reason of former conversations and conduct on her part; hence the prosecuting attorney indulged in asking her some questions refreshing her memory, and which, of course, were in the nature of a cross-examination. We have examined very carefully the disclosures of the record touching upon this examination and have reached the conclusion that there was no reversible error in the questions propounded to Alice Shackleford by the prosecuting attorney. The decided weight of authority is favorable to the rule that there should be an exception to the rule forbidding a party to contradict his own witness where the witness during his or her examination proves unexpectedly hostile in his or her testimony upon the stand. [Underhill on Crim. Ev., sec. 235, p. 289, and cases cited; 1 Greenleaf in Ev., sec. 444.]

Numerous other exceptions are preserved to the admission and exclusion of evidence during the progress of the trial. It is sufficient to say that after a careful examination of the record applicable to those subjects we are unable to find that there was any such

State v. Kebler.

error commited by the trial court as would endanger a fair and impartial trial to the defendant.

## III.

This brings us to the consideration of the instructions given by the court. Learned counsel for appellant complains at instruction number 1 and insists that this instruction was erroneous for the same reason upon which the challenge to the sufficiency of the information was predicated, that is, that it did not require the jury to find that the defendant had taken the female under the age of eighteen years from her father who had the legal charge of her without his consent or against his will. What was said in the discussion as applicable to the sufficiency of the information may be applied to the challenge to the correctness of instruction number 1. As heretofore pointed out, we held that it was not essential to the sufficiency of the information to charge that the act of the defendant was against the will of the father and without his consent; it therefore follows that if it was not essential to be charged in the information it was not necessary to make proof of it, and if there was no necessity to prove it the court was not required to direct the jury to find such facts. Instruction numbered 1, in our opinion, correctly declared the law.

As to the other instructions, both for the State and the defendant, we find that the court covered every phase of the case to which the testimony was applicable. The instructions as given for the defendant are exceedingly favorable to him and were all that he was entitled to under the rules of law applicable to criminal trials.

Complaint is made that the court refused an instruction upon circumstantial evidence. There is no merit in this complaint. The trial court, by instruction numbered 4, very appropriately and fully covered the subject of the nature and character of testimony

essential to warrant the conviction of the defendant, and directed the jury specially that before they would be authorized to convict the defendant on circumstantial evidence alone the facts and circumstances must all form a complete chain, and all point to his guilt, and must be irreconcilable with any reasonable theory of his innocence, and before they were authorized to convict the defendant on circumstantial evidence alone, the circumstances must not only be consistent with his guilt and point directly thereto, but must be inconsistent with any reasonable theory of his innocence. Manifestly this was placing the subject of circumstantial evidence before the jury about as clearly and strongly as any case we have ever had occasion to investigate. The additional instruction requested by the defendant and which was by the court refused, was entirely unnecessary in view of the instruction given by the court, and furthermore was objectionable upon the ground that it was more in the nature of an argument to the jury than a declaration of law applicable to the facts detailed in evidence. The action of the court in refusing such additional instruction upon circumstantial evidence was entirely proper.

## IV.

It is next insisted by learned counsel for appellant that the testimony developed upon the trial was insufficient to support the verdict as returned by the jury. We have upon this proposition carefully read in detail all the testimony disclosed by the record, and in our opinion it clearly furnishes full support to the verdict of the jury. In fact after reading all the details of the defendant's acts in relation to Rettie Smith, we are unable to comprehend how any other conclusion could have been reached by the jury than that the defendant was guilty of the offense as charged in the information. Whatever conflicts there may be in the testimony, it was entirely the province of the jury

to solve, and their solution of such conflicts in the testimony seems to have met the approval of the trial court, and there being substantial evidence to support the finding of the jury their verdict should not be disturbed on the ground that there may appear to be some conflict in the testimony of the witnesses.

We have indicated our views upon the legal propositions disclosed by the record in this cause, and finding no reversible error the judgment of the trial court should be affirmed, and it is so ordered. All concur.