## THE STATE v. WALTER LEWIS, Appellant.

### Division Two, March 12, 1913.

1. **MURDER: Degree:** Instructions: Appeal. Where defendant was convicted of murder in the second degree, it becomes unnecessary for the Supreme Court to discuss assignments of error in an instruction on murder in the first degree.

2. ————: **Second Degree: Malice: Instructions.** It is not error to fail to refer to self-defense in an instruction on murder in the second degree. Malice aforethought, an element of murder in the second degree, is not consistent with the theory of self-defense.

3. **MANSLAUGHTER: Fourth Degree: Cruel or Unusual Manner: Instructions.** Where the evidence all tended to show that a killing was voluntary or intentional, an instruction was erroneous which in effect required the jury to find that the shooting was not done in a "cruel or unusual manner" before they could find defendant guilty of manslaughter in the fourth degree. Such instruction either undertook to blend the two statutory definitions of manslaughter in the fourth degree, or to confuse with and blend in the definition of manslaughter in the fourth degree, under Sec. 4468, R. S. 1909, the converse or negative of the requirement of manslaughter in the second degree under Sec. 4460. In either case it was error.

4. **HOMICIDE: Extrajudicial Statements: Instructions: Nonprejudicial Error.** An instruction that what defendant has said against himself the law presumes to be true, but what he has said in his own behalf the jury are not obliged to believe, cannot be held to be prejudicial error even though there is no evidence upon which to base it.

5. ————: ————: **Weight of Defendant's Testimony: Joined in One Instruction.** It is error to include in an instruction

with reference to weighing the testimony of the accused given at the trial, a further direction as to the law governing the weight to be given to his extrajudicial statements.

6. ———: **Self-defense: Instructions.** A clause in an instruction on self-defense, to-wit: "and at the time he shot he had reasonable cause to believe, and did believe, that it was necessary for him to shoot and kill to protect himself from such apprehended danger, you will find the defendant not guilty on the ground of self-defense," is not approved.

Appeal from Washington Circuit Court.—*Hon. E. M. Dearing,* Judge.

REVERSED AND REMANDED.

*Farris & Watson, Byrns & Bean, S. G. Nipper* and *M. E. Rhodes* for appellant.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

WILLIAMS, C.—Defendant, under an information charging him with murder in the first degree, for shooting to death with a pistol one James Edsell, on August 6, 1911, was, at the March term, 1912, of the circuit court of Washington county, convicted of murder in the second degree, and his punishment fixed at twenty-five years in the penitentiary. He appeals from the judgment.

The substantive facts brought out by the State's evidence are about as follows:

The shooting occurred between seven and eight o'clock, p. m., on Sunday, August 6, 1911, near the east front of the Providence Baptist church house, a short distance from Richwoods, near the north line of Washington county, Missouri. On this Sunday evening the people of the neighborhood were gathering there to attend church services. Prior to the arrival there of either the deceased or the defendant a quarrel and fight had occurred on the church grounds between Jim Lewis, a brother of defendant, and one Billy Patton. The boys had been separated and the

trouble just about concluded when the deceased arrived at the church. Deceased, who was an official of the church, had heard the noise of the fight while on his way to the church, and upon his arrival inquired into the trouble and told the boys that they would have to stop fussing. He was standing on a little porch or platform in front of the church door when the defendant's brother, who had participated in the fight, came near him and said that he felt like he had been run over, and that he had always behaved himself. To this deceased made reply: "Yes, you always behave yourself;" and further said, "I feel like I have been run over, too." Just at this time defendant arrived, accompanied by Miss Laura Palmer, a neighborhood girl whom he was escorting to church. Several people had congregated in front of the church by this time, and defendant and Miss Palmer passed up through the crowd, stopping within three or four feet of the platform on which deceased was standing. The Rev. Mr. Brown, who had been in the church building, stepped to the door and said to deceased, "Brother Edsell, we had better go in and have church," and deceased replied, "I don't believe we can have any church now. It looks like they have come here for trouble, and we had just as well pair out and give it to them." Defendant then said, "I think you have said enough—I can attend to you in a minute." Some of the evidence for the State is to the effect that when deceased told the boys they would have to stop fussing, defendant stepped up and said "stop it then." Immediately after defendant had so spoken, deceased stepped off the platform, which was but two steps from the ground, and struck the defendant under the left eye with his fist. The blow staggered the defendant. Some witnesses testified that it staggered him backwards a distance of eight or ten feet; others, that it knocked him down, and others, that the blow did not knock him entirely down. Immediately after the blow

was struck a pistol was fired, the ball striking Miss Palmer on the right side. One witness for the State testified that the shot was fired by defendant. A crowd gathered around the Palmer girl, who had fallen, and the fight between deceased and defendant was temporarily suspended, the defendant going some twenty-five or thirty feet north and east, and around a tree standing to the northeast of the church house, and coming back in front of the building, with a pistol in his hand, and down to where the crowd was gathered about the Palmer girl, and close to where deceased was standing in a stooping position, looking at the wounded girl. Here the deceased saw the defendant, straightened up, and began striking at him, the defendant retreating and deceased following and attempting to strike or get hold of the defendant. Deceased caught the defendant after going about thirty or forty feet, and at this point, while they were scuffling and fighting, defendant held his pistol against the body of the deceased and fired two shots in rapid succession, one bullet penetrating the small intestines, and the other following the course of a rib on one side of the body. Thereupon deceased released his hold of defendant, and the defendant ran, going in the southeasterly direction, towards his home. Deceased's shirt was on fire from the fire of the pistol. He brushed the fire out, walked into the church building, and said, "Boys, they have got me." He then became sick, and lay down on the floor, and a doctor was summoned. He was removed later to his home, a short distance away, in Franklin county, and died the following Tuesday morning as the result of the shooting.

The Palmer girl was removed to the home of a neighbor. One witness for the State testifies that about midnight, the night of the shooting, defendant came to the house where the Palmer girl was, and went up to her bedside and said, "Laura, I shot you

and killed you;" the girl replying that he did not do it on purpose, and that she was not dead yet.

Dr. Foard testified for the State that he had attended both of the wounded on the night of the shooting, and that the wounds of both were caused by the same sized bullets. This witness also testified that about two weeks before this trouble, while in his office, discussing with defendant a fight which had occurred between defendant's brother, Jim, and one of the Edsell boys, defendant said he wished that it had been he instead of Jim, and that he would not have used a rock like Jim did, but would have used something else, and that if he "ever got into it" with any of them (meaning the Edsells) he would "fix them."

The testimony on the part of the defense differs from that for the State in this: The former tends to show that the first shot fired was not fired by the defendant, and that deceased, after said shot was fired, instead of going down to where the wounded girl was, just looked in that direction, and immediately turned and pursued the defendant, striking at him, and finally catching him after going a distance of about forty feet, and that defendant and deceased had hold of each other and were struggling when defendant fired the two shots.

One witness for defendant testified that about a month before this trouble he was talking with deceased about the hauling of some ties, and told deceased that he knew some fellows who would haul them; that deceased asked him who they were, and he replied that one of them was Walter Lewis (the defendant), and that. thereupon deceased said "he didn't want anything to do with them, and he didn't want any of them ever to cross his path." The witness said he communicated the substance of this conversation to the defendant the following Sunday, and told defendant he could not have him haul the ties for

the reason that deceased did not want him around, and that he (deceased) "might hurt him some time."

Miss Palmer, the wounded girl, testified that defendant, on the night of the shooting, did not make the statement at her bedside that he had shot her.

Thomas Miller, Sr., another witness for the defense, testified that the deceased, a short time after the fight between young Patton and Jim Lewis, put his hand on Patton's shoulder, and said "stay with him." This witness further testified that the trouble had been settled when defendant came up, and that deceased was still "rearing;" that deceased said they were dogs, and always trying to raise trouble, and that they were afraid to say anything themselves.

The Rev. Mr. Brown testified for the defense that deceased, while standing on the platform, said to the Patton boy, "If you are in the right, stay with him, and if you are wrong, give in;" that he (witness) thereupon told deceased to think of himself and not create any more trouble than they already had; that he saw deceased could not control his passion, and he again cautioned him, but that deceased did not pay any attention to him. This was just before the trouble started between defendant and the deceased.

Witness Tyree, for the defense, testified to a dying declaration by the deceased. He said that deceased told him that one John Brunk fired the first shot, and that from the way they were situated it was impossible for the defendant to have shot the girl; that deceased said he saw the girl fall, and he turned his attention to her, "and the first thing he knew he (defendant) was right back there at him, 'and I was hot, and I went right after him.' "

Defendant testified that he did not know who fired the first shot; that after deceased struck him he started to run away, and deceased followed him, striking at him, and finally caught up with him, grabbing him by the shoulder and whirling him around; that he thought

deceased would kill him; that as soon as he could get his pistol out of his pocket, after deceased had grabbed him, he shot him, and that he did not know how he shot him; that he didn't think he had his arm on deceased's shoulder; that he was excited, and that if he had hold of the deceased at the time he did not know it.

The evidence showed that there was considerable excitement in the crowd during the progress of the quarrel and fight. Deceased was about forty-one years of age, strong and muscular, and weighed between 175 and 180 pounds. Defendant's age was about twenty-three years, and his weight between 165 and 170 pounds.

Assignments of error are directed at certain instructions given by the court, over defendant's exceptions, and the same will be given attention in the course of the opinion.

I. Defendant first insists that instructions numbered 1 and 2, given on the part of the State, are erroneous in that each undertakes to cover the entire case, and yet entirely ignores the right of self-defense.

Self-defense: Instructions.

Instruction No. 1 covers murder in the first degree, and No. 2, murder in the second degree. Defendant having been convicted of murder in the second degree, it becomes unnecessary to discuss any error assigned as to the instruction on murder in the first degree. [State v. Riddle, 179 Mo. l. c. 298.]

As to instruction two, we think defendant's contention groundless. The elements of murder in the second degree are inconsistent with and necessarily exclude the elements of self-defense. Malice aforethought must exist in finding guilt in the second degree, and is not consistent with the theory of self-

defense. It is therefore not error to fail to refer to self-defense in an instruction on murder in the second degree. [State v. Lawson, 239 Mo. 591.] Instruction two fully covered the subject of murder in the second degree, and that was all that was required of that instruction. The foregoing observations in no way conflict with the holding in State v. Helton, 234 Mo. 559, cited by defendant.

II. The instruction given by the court on manslaughter in the fourth degree is objected to. The portion of the instruction complained **Manslaughter:** of in effect required the jury to find **Instructions.** that the shooting and killing of deceased by defendant was not done "in a cruel or unusual manner" before they could find him guilty of manslaughter in the fourth degree.

Section 4460, Revised Statutes 1909, defines manslaughter in the second degree as "the killing of a human being, *without a design to effect death,* in a heat of passion, but *in a cruel or unusual manner,* unless it be committed under such circumstances as to constitute excusable or justifiable homicide."

·There are two sections defining manslaughter in the fourth degree. Section 4467 defines manslaughter in the fourth degree as "the *involuntary* killing of another by a weapon, or *by means neither cruel nor unusual,* in the heat of passion, in any case other than justifiable homicide." Section 4468 further defines. manslaughter in the fourth degree as "every other killing of a human being by the act, procurement or culpable negligence of another which would be manslaughter at common law, and which is not excusable or justifiable," etc.

The evidence in this case all tends to show that the killing was intentional or voluntary. Voluntary manslaughter, as embraced by section 4468, supra, has been defined by this court in State v. Sebastian, 215

Mo. l. c. 80, as "the intentional killing of a human being in a heat of passion, on a reasonable provocation, without malice and without premeditation, and under circumstances which will not render the killing justifiable or excusable homicide."' One of the requirements of second-degree manslaughter is that the killing must be done "in a cruel or unusual manner," and one of the statutory negative requirements of *involuntary* manslaughter in the fourth degree is that the killing be by "means *neither* cruel *nor* unusual." But it will be noticed that the definition of voluntary manslaughter in the fourth degree, as given above, does not require the absence of "a cruel or unusual manner."

It is therefore apparent that the instruction in question either undertook to blend the two statutory definitions of manslaughter in the fourth degree, or to confuse with and blend in the definition of manslaughter in the fourth degree, under section 4468, the converse or negative of the requirement of manslaughter in the second degree under section 4460.

It has been held to be error to blend the definitions of manslaughter as defined in sections 4467 and 4468, supra, in one instruction. [State v. Chambers, 87 Mo. 406.] It is likewise error to blend the negative or converse of manslaughter in the second degree with voluntary manslaughter in the fourth degree, and especially so where the evidence does not tend to prove manslaughter in any degree except voluntary manslaughter in the fourth degree. The jury might consider that killing by shooting was not unusual, since the majority of homicides are perhaps accomplished in that manner; but we doubt very much if a jury would ever find or consider that an intentional or voluntary killing with a pistol was *not* cruel, as is required by this instruction.

The instruction in the form given had the effect of destroying the otherwise correct definition of man-

slaughter in the fourth degree contained therein, and left the matter very much in the same situation as if the court had failed to instruct on manslaughter in the fourth degree, as called for by the evidence in the case.

III. Instruction 9, given by the court, is as follows:

"You are further instructed that the defendant is a competent witness in this case in his own behalf, and his testimony is to be weighed by the same rules that govern the testimony of each and every Extrajudicial other witness in this case; but in weigh-Statements of Defendant: ing his testimony the jury may take in-Instructions. to consideration, only as affecting his credibility as a witness, the fact that he is the defendant in the case on trial and his interest in the result of the trial.

"And you are further instructed that the statements, if any, made by the defendant in his own favor, you are not bound to believe; but you may accept and believe or reject and disbelieve the same accordingly as you may believe the same to be true or false; and statements, if any, made by defendant against his interest are presumed to be true, because made against his interest."

Defendant contends that this instruction is erroneous in that, first, there was no evidence upon which to base the second paragraph thereof, and, second, that as said paragraph constituted part of the instruction on the weight to be given the testimony of accused, it tended to mislead the jury into believing that it had reference to his testimony upon the trial, and not to statements made out of court.

The first point has been decided adversely to defendant's contention by this court. [State v. Coleman, 186 Mo. 151.] Defendant's second contention, however, is well founded. The first paragraph of said

instruction states the law with reference to weighing the testimony of accused given upon the trial. The second paragraph states the law with regard to the weight to be given any extrajudicial statements proven to have been made by accused affecting the issues in controversy; and the same would not be a proper rule for weighing the testimony of the accused. Included as it was in this instruction, which states the law as to the weight to be given the testimony of the accused, the jury might be, and possibly were, misled into the belief that the second paragraph should also be applied to the testimony or statements made by accused while a witness. Whenever an instruction announcing the rule contained in said second paragraph is warranted by the evidence, it should be given separately, and so worded as to make it clear that it applies to proven statements or declarations of the accused made out of court.

IV. The instruction given by the court on self-defense is attacked, the objection being to the following portion thereof: "And at the time he shot he had reasonable cause to believe, and **Self-defense: Instructions.** did believe, that it was necessary for him to shoot *and kill* to protect himself from such apprehended danger, you will find the defendant not guilty on the ground of self-defense." Since the case must be retried, we would suggest, if the evidence upon retrial is in effect the same as upon the first trial, that the above quoted portion of the instruction on self-defense be changed to read as follows: "And at the time he shot he had reasonable cause to believe, and did believe, that it was necessary for him *to use his pistol in the way he did* to protect himself from such apprehended danger, you will find defendant not guilty on the ground of self-defense, *although such shooting resulted in the death of the said James Edsell.*"

The above is not to be taken as a guide generally

in a self-defense instruction, but is only meant to suggest an amendment to the instruction given, so that the same, when so amended, will more clearly and fairly present the issue of self-defense to the jury. The instruction given was quite lengthy, and could have been stated in fewer words, but aside from the portion above criticised, the same fully and fairly covered the law of self-defense as applicable to the evidence in this case.

Other assignments of error are urged by defendant, but upon careful examination are not found to be of sufficient importance to merit discussion.

The judgment is reversed and the cause remanded for new trial. *Roy, C.,* not sitting.

PER CURIAM.—The above opinion by WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.