## THE STATE v. LEWIS, *Appellant.*

### Division Two, November 20, 1898.

1. **Criminal Practice:** MURDER: INSANITY: EVIDENCE. A defendant charged with murder is not entitled to cross-examine a witness in chief for the state for the purpose of showing the insanity or mental disorder of defendant; such defense being an affirmative one, in the nature of a confession and avoidance.

2. ———: ———: INSTRUCTIONS. Where there is no evidence of self-defense, instructions thereon are properly omitted.

*Appeal from St. Louis Criminal Court.*—HON. H. L. EDMUNDS, Judge.

AFFIRMED.

*Silver & Brown* for appellant.

(1) The court erred in refusing to allow defendant to show by Dr. Frank and Dr. Coryell that she had received injuries nine or ten months before the homicide which predisposed her to attacks of unconsciousness, hysteria, and other disorders of her powers of perception, reason, memory or will, when under the influence of excitement from any cause. She testified that after the deceased struck her the second time she became unconscious and did not regain consciousness until after she was taken to the hospital. She neither admitted nor denied the killing. The court properly instructed the jury that if, at the time of the shooting, she was, from any cause, so unconscious of her acts, as not to know what she was doing, they should acquit her. (2) It was error to compel her to go to the jury upon her uncorroborated testimony upon a point conceded by the court to be vital to her defense when she

had competent corroborating testimony at hand upon that point which she was precluded by the ruling of the court from presenting for their consideration. (3) The defense sought to be established here was in effect the positive, affirmative defense of insanity, and the burden of establishing it rested upon the defendant. *State v. Schaefer*, 116 Mo. 96, and cases cited; *State v. Redemeier*, 71 Mo. 173. The defendant was clearly entitled to establish her affirmative defense by positive and competent testimony, and she was not required to wait until her own testimony on that point was attacked before being allowed to establish her case. *Baldwin v. State*, 12 Mo., side p. 231; *State v. Redemeier*, 71 Mo. 173; *State v. Williamson*, 106 Mo. 162. (4) The defense of insanity need only be established to the reasonable satisfaction of the jury. This has been the law in this state since the decision in *Baldwin v. State*, 12 Mo., side p. 232. *State v. Redemeier*, 71 Mo. 173; *State v. Williamson*, 106 Mo. 162; *State v. Schaefer*, 116 Mo. 110. (5) The court undertook to give proper instructions, and it was its duty to do so, whether asked or not, the matter in question not being a collateral one. *State v. McNamara*, 100 Mo. 100; *State v. Brooks*, 92 Mo. 543. (6) The court committed reversible error in instructing the jury upon murder in the second degree. The testimony for the state showed the defendant guilty of murder in the first degree; that for defendant showed her guilty only of manslaughter of the fourth degree, or of no offense at all. There was no evidence upon which to base an instruction for murder in the second degree. *State v. Mahly*, 68 Mo. 318, 319; *State v. Stoeckli*, 71 Mo. 559; *State v. Schoenwald*, 31 Mo. 151; *State v. Starr*, 38 Mo. 269; *State v. Alexander*, 66 Mo. 148. (7) According to the testimony of defendant, she did not know whether she killed the deceased or not. If she did kill him she was not con-

scious of it.   The testimony that another killed him was not necessarily inconsistent with her own, and she was entitled to interpose as many defenses as she had, provided they were not inconsistent with each other. (8) The court erred in refusing to permit proof of a previous brutal assault upon defendant by deceased. Such evidence would have tended to show a reasonable fear of danger impending and about to fall, the apprehension of which up to the point of unconsciousness would have impelled her afterward to impulsively defend herself against the attack, even to the taking of the assailant's life.

*R. F. Walker*, attorney general, and *C. O. Bishop* for the state.

(1)   There is no error on the face of the record proper.  (2) The instructions fully cover the law of the case and are favorable to appellant.  (3) There was no testimony admitted over defendant's objections which was incompetent.  (4) Insanity is an affirmative defense, a plea of confession and avoidance, and evidence of insanity is only admissible upon the theory that the accused committed the act but was excused from criminal responsibility.   *State v. Pagels*, 92 Mo. 300.   So also self-defense is an affirmative, positive, intentional act.   *State v. Gilmore*, 95 Mo. 554; *State v. Smith*, 114 Mo. 406.

BURGESS, J.—At the October term, 1895, of the St. Louis criminal court the defendant was convicted of murder in the second degree and her punishment fixed at fifteen years' imprisonment in the penitentiary, for having shot and killed with a pistol at said city on the thirteenth day of May, 1895, one Peter R. Morrissey.   The case is before us for review on defendant's appeal.

The statement of facts made by counsel for the state is conceded to be correct by defendant. It is as follows:

Deceased was the proprietor of a saloon and restaurant in the city of St. Louis; appellant was the keeper of a bagnio at 2719 Wash street; and there had been for some time illicit relations between them which had been at intervals broken off and resumed. On the night of May 12, 1895, in the neighborhood of 11 o'clock, deceased was in his saloon chatting with various friends, among whom were two young physicians, named Frank and O'Reilly. Appellant, accompanied by one of' her "girls," came into the lunch room adjoining the saloon; she called to the deceased to come and drink with her, but he declined, saying he had friends with him, to which she retorted, "damn your friends." She several times repeated the invitation, coming to the door between the two apartments, but he continually declined, until about midnight, when, after ordering everybody out of the saloon and directing his barkeeper to close up for the night, he went into the lunch room accompanied by the two doctors. The party drank together several times, during which appellant urged deceased to go home with her, he refusing and at one time telling her he proposed to go and see some other woman that night. Deceased seemed vexed by her persistency, and at one time took a bank note from her purse and tore it in two, throwing the pieces on the floor; they were picked up by one of the doctors and returned to her.

At length deceased agreed to go with her to her home if his friends would go; a carriage was sent for and the whole party left the saloon. Deceased seemed very drowsy and went to sleep in the carriage. They arrived at the house of appellant about 2 o'clock in the morning of May 13, 1895. The doctors and the "girls"

went in, but deceased refused to leave the carriage for some time, and did not get out until a police officer came up, and he was assisted in the house by him and the appellant. The entire party were then in a parlor or reception room, about in the center of the house, to which access was had by a hall from the front door; in front of this parlor, next to the street, was the bed chamber of appellant, and in the rear was the kitchen; from the parlor a flight of stairs led to a hall on the second floor and to rooms over the parlor and bed chamber occupied by appellant's two "girls," and over the kitchen was a small room occupied by an old man named Andrews, a sort of *factotum* in the establishment. After drinking some beer, the doctors retired upstairs, each with a girl, the officer withdrew and appellant and deceased were left together in the parlor.

The parties upstairs had disrobed and lain down, when two noises were heard in succession like the "slam of a window." Dr. O'Reilly sprang from the bed, opened the door and saw the man Andrews going downstairs; he called to Dr. Frank and followed Andrews down, being in his underclothes; when he got into the parlor he found appellant swearing and hysterical, and saw that Andrews had a pistol in his hand; going into the bedroom he found Morrissey lying in the bed on his back with one arm under his head and the other across his breast, his eyes closed as if asleep, two wounds in his face, and the skin powder burned; he was dead. Dr. Frank partially dressed himself and went downstairs; found appellant struggling with Andrews to get possession of a pistol and shouting, "I've killed my Pete; give me that pistol I want to kill myself." He also went into the bedroom, found Morrissey in the bed, noticed that he lay lengthwise and straight, and that he was covered up to the chest with the bed clothes, which were tucked in all around the

edge of the bed; he examined deceased, found him to be dead; he was dressed in underclothes, shirt and socks.  The girls dressed themselves and went out for an officer, and soon after the whole party were taken to the nearest police station, while the body was conveyed to the morgue; appellant and Andrews were held in custody for the coroner's inquest.

An autopsy revealed that only one of the wounds was fatal; a bullet had entered the inner angle of the right eye, passing upwards and backwards through the brain, and lodged in the parietal bone, on the top of the head, on the right side, causing instant death; the other wound was in the mouth; the face was badly powder burned.

There was also testimony that at various times preceding the killing and up to within three nights before, appellant had made threats against deceased; on one occasion she had a large revolver concealed in a muff, which was taken from her by a police officer.  One of the threats was "I'll shoot his G——d eye out;" and another was "I'll shoot out the pretty brown eye of the son of a bitch."

The testimony on the part of the defense was as follows:

Appellant, testifying in her own behalf, stated that after the two girls and the doctors had withdrawn, deceased began to abuse her, knocked her down, caught her around the throat and choked her, and then struck her on the head, whereupon she lost consciousness and knew nothing more until she came to at the city hospital. A physician testified that he examined her in the jail about three weeks after the homicide and found evidence of injuries on the right side of the frontal bone, and abrasion of the skin, some marks on the back and shoulders, and on the left leg in three places below the knee, and some soreness on the back of her left hand.

The man Andrews testified, as a witness for the defense, that he was the husband of the appellant; that just preceding the homicide he came down the stairs to get a hot iron out of the kitchen and saw deceased beating appellant into unconsciousness; that he dragged the woman into the parlor, laid her on the sofa, went back to deceased and began to upbraid him for his brutality; that deceased seized him by the throat, pushed him back over a wash stand, and as he (Andrews) threw his hand back to steady himself, he felt the pistol lying on the stand, quickly seized it, raised and discharged it several times in the face of deceased who fell back upon the bed; that he then composed the body, covered it up, picked up the pistol and concealed it in his clothing; all of which was done before the doctors came downstairs.

The state in rebuttal introduced some testimony as to former sworn statements of Andrews for the purpose of contradiction and impeachment.

The court instructed as to murder in the first and second degrees, and manslaughter in the fourth degree, circumstantial evidence, credibility of witnesses, competency of defendant and reasonable doubt.

The second instruction was: "Unless you believe and find from the evidence beyond a reasonable doubt that the defendant shot and killed Peter R. Morrissey, you will acquit her." The eleventh instruction was: "The court further instructs you that if you believe and find from the evidence that the defendant shot and killed Peter R. Morrissey, but at the time of the shooting she was from any cause so unconscious of her acts as not to know what she was doing, you will acquit her."

To the giving of all the instructions, exceptions were saved; appellant asked no instructions.

1.  Defendants first contention is that the court erred in refusing to permit her to prove by Dr. Frank,

a witness for the state, on his cross-examination, that nine or ten months before the homicide she had received injuries which predisposed her to attacks of unconsciousness, hysteria and other disorders of her powers of perception, reason, memory or will, when under the influence of excitement from any cause. While her plea was, not guilty, this was not necessarily a denial of the shooting, as she may have done it while temporarily insane, or in self-defense, but she testified that after the deceased struck her the second time she became unconscious and did not regain consciousness until some fourteen hours thereafter, and had no recollection as to the shooting.

We are unable to see upon what theory the proffered evidence under this plea, the statement of her counsel at the time it was offered "that she did not shoot him" and her testimony that she knew nothing of the shooting, was admissible at the time offered. Now, if the homicide had been admitted by defendant, or after it was shown by the state to have been committed by her she had then undertaken to excuse it upon the ground of want of capacity from any cause at the time to distinguish between right and wrong, there could be no question as to the admissibility of such evidence as tending to corroborate her in her statements as to her unconsciousness, but it could not be shown in the cross-examination of the state's witnesses unless the court in whose discretion it was saw proper to permit it.

If she committed the homicide the defense of insanity was an affirmative one, which could not properly be shown upon the cross-examination of the state's witness, and the court committed no error in so ruling. Moreover, the court announced that the witness could be recalled by defendant when it came to the defense. If she did not commit the homicide the evidence was

inadmissible for any purpose, for under such circumstance the condition of her mind was immaterial. But the homicide being shown to have been committed by defendant the burden was upon her to show some legal justification or excuse for it, and if excusable upon the ground of insanity, it must have been shown to the reasonable satisfaction of the jury. *State v. Schaefer,* 116 Mo. 96, and authorities cited.

"Indeed, the plea of insanity is itself, and of necessity, a plea in the nature of a plea of confession and avoidance, the courts differing as to the *quantum* of evidence to sustain such a plea. 1 Whart. Crim. Law [9 Ed.] sec. 61. Such plea is but a bare denial of a *part of* the government's case; it admits the *act* charged, but avers that there was no criminal intent accompanying the act, and, therefore, denies the crime charged. 2 Bish. Crim. Proc. [3 Ed.] sec. 669." *State v. Pagels,* 92 Mo. 309; *State v. Welsor,* 117 Mo. 570. Upon this theory of the defense the court instructed the jury in accordance with these views, which was, we think, clearly correct.

2. The facts disclosed by the record warranted the court in instructing the jury for murder of the second degree. There is no merit in the contention of defendant to the contrary.

3. There was no self-defense in the case, consequently no error was committed in failing to instruct upon that theory of the case.

The instructions given covered every phase of the case, and were exceedingly fair to the defendant. The evidence showed her guilty beyond any reasonable doubt and there is no error apparent in the record which would justify a reversal of the judgment. It is therefore affirmed. All of this division concur.