THE STATE v. T. I. JOHNSON, Appellant.—64 S. W. (2d) 655.

Division Two, October 28, 1933.

*A. F. Haney, N. W. Simpson* and *Charles D. Stewart* for appellant.

12

*Roy McKittrick*, Attorney-General, and *Wm. Orr Sawyers*, Assistant Attorney-General, for respondent.

LEEDY, J.—Appellant was convicted at the November, 1931, Term of the Circuit Court of Lewis County, under an indictment charging him with forgery in the third degree. His punishment was assessed by the jury at imprisonment in the penitentiary for a term of two years, and from the sentence and judgment rendered in accordance with the verdict, he has appealed.

The indictment was drawn in two counts, but at the close of the State's evidence, it elected to stand on the first count thereof, which charged an offense under Section 4190, Revised Statutes 1929 (Sec. 4190, Mo. Stat. Ann., p. 2943), and that appellant, on or about December 1, 1928, did "unlawfully, feloniously and wilfully forge, counterfeit and falsely make a certain false, forged and counterfeited promissory note . . . purporting to be the act of another and which . . . purported to create a pecuniary demand and obligation . . . of the purport and effect as follows:

"$2400.00                                LaGrange, Mo., Dec. 1st, 1928
                "SIX MONTHS after date we promise to pay to
                    LaGRANGE SAVINGS BANK, or order
Twenty Four hundred .............................:o/100 Dollars, for value received, negotiable and payable without defaulcation or discount, with interest at the rate of 6 per cent per annum from date, until paid. Interest payable annually, and if not so paid to be added to and become part of the principal and bear the same rate of interest.

"The makers signers and endorsers of this note severally waive demand, notice and protest and agree to all extensions and partial payments, before or after maturity, without prejudice to the holder.
"No.            P. O., Monticello, Mo.          W. M. HILBERT
   31524         Due—June, 1st, 1929            LANE B. HENDERSON
"And afterwards, the said T. I. Johnson wrote on said note following the purported signatures of W. M. Hilbert and Lane B. Henderson the following: 'Farm Acct. Johnson-Hilbert & Henderson.' with the felonious intent then and there to injure and defraud," etc.

At the time the indictment was returned, as well as at the time of the trial, Mr. Walter M. Hilbert, one of the prosecuting witnesses, was Prosecuting Attorney of Lewis County, and he being disqualified to act in such capacity, a special prosecutor was duly appointed and qualified, who conducted the grand jury investigation which resulted in the returning of the indictment herein, and the prosecution thereof on the part of the State.

The evidence shows that appellant was a lawyer and banker; that he resided at Monticello in Lewis County continuously from 1893 until 1925, and in the latter year removed to LaGrange, in the same

county; that thereafter and at the time of the commission of the offense alleged in this case and until September, 1929, he was engaged in business as cashier of LaGrange Savings Bank, which institution closed its doors and suspended business about a year after the date last mentioned.

In 1912, a 560-acre farm, known as the Laytham farm was acquired at a partition sale by what appellant described as a partnership composed of appellant, George Davis, Charles Brown and the two prosecuting witnesses, Lane B. Henderson and Walter M. Hilbert, and title thereto was taken and held in the name of appellant for the benefit of himself and the other persons just mentioned. It appears that the purchase price of the farm was the sum of $22,000, and that appellant himself not only conducted the negotiations which culminated in the plan of financing adopted in the transaction, but that he actually provided the capital therefor, which the undisputed evidence shows was accomplished in the manner following: By advancing $2000 of his personal funds at the time the bid was made, borrowing on his unsecured note the sum of $12,000 from a bank at Quincy, Illinois, and the balance, $8000, being transferred from his checking account at Monticello Trust Company. About a year later there was a refinancing of the farm by what was referred to as the Bauman loan, under which a deed of trust was placed on the premises which secured notes aggregating $12,000, signed by Mr. Johnson and wife, Mr. Hilbert and wife, Mr. Brown and wife, and Lane B. Henderson. Mr. Davis having in the meantime disposed of his interest by a sale to the others associated with him in the venture did not sign the notes, and need not be further noticed. The Bauman loan was paid off by the proceeds of a loan made by Monticello Trust Company, which in turn was paid off by a Federal Land Bank loan for $15,000. But in the latter transaction, on account of deductions of $750 for Land Bank stock, $150 for commission, and other miscellaneous items of expenses incurred in connection with the loan, the net proceeds derived therefrom lacked $1400 of being sufficient in amount to pay off and discharge the Monticello Trust Company's loan, and this deficiency was made up personally by appellant. In that connection defendant testified that he had a conversation with Mr. Hilbert concerning the amount that the Federal loan lacked of taking up the other indebtedness, and the payment of the $1400, and that "Mr. Hilbert said I could go ahead and arrange that." It appears the note and deed of trust securing the Federal loan was signed only by appellant (in which his wife joined) he being the record owner of the premises. About the time of the making of such loan Mr. Brown's interest was acquired, one-half by appellant, and the other half by Messrs. Hilbert and Henderson, and appellant then executed and delivered to them a quitclaim deed to an undivided

one-half interest in the farm, subject to the encumbrance last mentioned, which deed was never placed of record.

From time to time sales were made of parcels of the Laytham farm, and the proceeds thereof were either distributed among the partners, or applied on the indebtedness due appellant, Johnson, for that portion of the purchase price advanced by him, and not secured, or both, so that at the time of the alleged offense there remained in the farm 295.4 acres. Mr. Brown managed the farm from the time it was purchased until he sold out his interest and went to Texas in about 1923, when he was succeeded by appellant as manager. Throughout the whole period various improvements were made on the farm, which included the virtual rebuilding of the house and barn, fencing, clearing the land, constructing levees, ditches and drains, corn cribs, machine shed, granary, etc. The prosecuting witnesses, as stated in respondent's statement, said "They remembered receiving in all around $3000 when profits were divided on occasions between the owners." Appellant testified that he kept an account of the monies derived from the operation of the farm, as well as his disbursements, and that three statements thereof were rendered from time to time to the prosecuting witnesses, which covered the period from September 26, 1923, to October 1, 1929, and which showed, respectively, balances of $1360.64, $7314.77 and $7966.34 owing to him by the partnership; that said sums represented expenditures made by him in the operation of the farm over and above the income derived therefrom, and that one-half of the total balance, to-wit, $3983.17 is still due and owing appellant by the prosecuting witnesses.

Appellant testified that during the time of Brown's management he, Brown, frequently borrowed money to finance the farming operations by "signing the firm's name to the note," of which Mr. Hilbert, at least, had knowledge and assented thereto, and that when appellant succeeded Brown as manager, he continued that practice; he further testified that Henderson, who removed to Shelbina in 1923, "never was at the place but a few times, as far as I know, and Hilbert gave it very little attention." Appellant testified that he on numerous occasions went to Mr. Hilbert, who, as appellant contends, was also acting on behalf of Mr. Henderson, and said to him, "The farm is indebted. He would say 'Tom, you know how to do that better than I do. I haven't any money. We have got to borrow it. Go ahead and attend to that.'"

For aught that appears in the record, there was nothing to even remotely indicate there had been any attempt to simulate the genuine signatures of the prosecuting witnesses, but on the contrary appellant admitted signing their names to the note, and says that he was authorized by them to manage the finances of the partnership business, and under the practice and custom of Mr. Brown, as well as himself, in borrowing money for partnership purposes, he

was authorized to make the note in question, although it is not contended that he had express authority from either of the prosecuting witnesses with respect to the signing of this particular note. Lane B. Henderson and Walter M. Hilbert testified that the signatures to the note in question were not theirs, nor had they, or either of them, at any time, authorized anyone to sign the same for them, and they did not know of its existence until notified by the payee and holder thereof, LaGrange Savings Bank, of the fact it had matured. The former testified that sometime after November, 1929, there was a conversation in the office of Mr. Hilbert in the courthouse at Monticello, between the appellant and the two prosecuting witnesses, in which appellant asked Messrs. Henderson and Hilbert if they would not take a mortgage on appellant's interest in the farm, and sign the note in question, or "take care of this note," and that Mr. Hilbert said to Mr. Johnson, "You didn't have any right to put our names on that note, Tom," and to which appellant replied, "Well, it is done, I guess I didn't." That the witness, Henderson, then said, "Tom, I can't do that. I have all the notes I can take care of, so far as I am concerned if I have got any interest in the farm that will help you take care of that note, you can just have it." Mr. Hilbert testified that he had a conversation with appellant in which he, appellant, "wanted to give Mr. Henderson and I a mortgage, he and his wife, and a note if we would take up this note, and I told him I would call Mr. Henderson over to the office and we would see. I called Mr. Henderson over and we declined to do it." He further testified that at one time he had been in partnership with appellant in the practice of law and "had transacted lots of business with him." The following appears in the cross-examination of Mr. Hilbert: "Now I will ask you if you, at that time, agreed with Tom (appellant) that you would give him your interest if he would take care of these notes?" To which the witness replied, "I didn't make an agreement. I told him he could have it. . . . He came there as I told you before asking about giving us this mortgage, and in the meantime I had made an examination and found out the taxes wasn't paid, and I found out there was a $3800.00 chattel mortgage down here on the stuff on the place and then he told me he had not paid the money owed the Federal Land Bank, and I said, 'There is nothing in it, you can have it as far as I am concerned.' "

Respecting the conversation held in Mr. Hilbert's office, above referred to, the appellant testified as follows: "I had given Mr. Hilbert a statement of the farm affairs and he said he would arrange to have Mr. Henderson come over and we would go over it together. He did and I met them there at Mr. Hilbert's office. I then asked them if they had gone over the statement, and he said it was so complicated, so much he did not understand, he had not had time to go over it carefully. I said to them, 'The farm is owing me $7966 and

some cents and half of that is owed by you.' Mr. Hilbert complained that the farm ought to be making money. . . . Mr. Henderson stated that they could not pay their part of it, that he had all the notes he could pay. Mr. Hilbert said he could not pay his part, that his wife had a few bonds and that was all. They stated to me that they would surrender their unrecorded deed if I would assume that payment of these notes. The Court: The payment of what? A. These two notes. That was in answer to my proposition to them that I could not with that fact being known, it being a fact that they owned an undivided half interest in the farm, that I could not get the money, and if they could not pay their part they should relinquish it and they agreed to do it. Q. Did they ever? A. They never did."

There was a sharp conflict in the testimony as to when the words "Farm Acct. Johnson-Hilbert & Henderson," which appear below the signatures and in the lower right-hand corner of the note, were placed thereon. The signatures were written in black ink, and the notation or inscription just referred to is in blue ink. There was also a pencil notation in the lower left-hand corner of the note consisting of the words "Farm Account." Appellant testified the latter words were written and placed thereon at the time the note was signed, December 1, 1928, and that afterwards, and "in the first half of September, 1929," while he was still cashier of the payee bank he made and placed the aforesaid ink notation on the note. He testified his official connection with the bank was severed September 14, 1929, and that prior thereto he had a conversation with Mr. D. Johnson, whom he knew would succeed him as cashier, in which appellant, in the referring to the ink notation, said, "I told him that I had done that, and why I had done it." On the part of the State it was shown by Mr. D. Johnson that either in the winter of 1929, or the following spring, appellant asked the witness to let him see the note, "and I handed it to him and he carried it into the office in the back of the bank, and presently returned the note, and I slipped it in the note case, at the time not examining the note at all. Afterwards when going over the notes, I found there was written below the signatures 'Farm Acct. Johnson-Hilbert & Henderson.' That notation was placed on the note at that time." On cross-examination the witness said he could not say if the lead pencil notation in the lower left-hand corner was thereon at the time just mentioned or not, or whether it was there at the time the witness first saw the note. He further testified, and in which he was corroborated, that he had a conversation with appellant respecting the making of the ink notation in which appellant was asked if he had not affixed such notation a few days previously and at the time he borrowed the note from the bank, and that appellant replied, "I did, to show what it was for."

When asked to explain to the jury why he had not requested

Messrs. Hilbert and Henderson to sign the note, instead of doing so himself, appellant said, "Because of that amiable relation and because of the fact that they, as I stated, that Mr. Hilbert said you go ahead I haven't any money, and get it whatever you do is all right in the matter, and because it was carried in that way, had been the custom during the management of Mr. Brown." On cross-examination touching that phase of the matter, and in reply to the direct question as to why his name was not also attached to the note, if it was a farm indebtedness, appellant said, "Because I had other notes at the bank at that time . . . and that would show probably an excess for me, it was their indebtedness, it was not my indebtedness as I considered it."

Such other facts as may be necessary to an understanding of the questions presented for review will be stated in the course of the opinion.

I. The first assignment of error relates to an alleged fatal variance between the allegations of the indictment respecting the description of the note in question and the evidence offered in proof thereof. The note is set out *in haec verba* in the indictment, and it will be observed there is no allegation therein respecting the words "Farm Account" which are written in lead pencil and appear in the lower left-hand corner of the note offered in evidence. It is contended that such words are a material part of the description, and being omitted from the note set out in the indictment, there is a variance. It is also urged that there is a variance because the indictment, in alleging what has been referred to as the ink memorandum, describes a hyphen or dash as used between the words "Johnson" and "Hilbert & Henderson," thus, "Johnson-Hilbert & Henderson," and the note in evidence contains no punctuation between such names, but is written as "Johnson Hilbert & Henderson." It is suggested that the three names as connected on the note as it appears in evidence indicate a partnership relation between all the persons mentioned, whereas the dash or hyphen separating the names indicates some other connection between Mr. Johnson and the partnership of "Hilbert & Henderson."

The statute, Section 3562, Revised Statutes 1929 (Sec. 3562, Mo. Stat. Ann., p. 3158), provides, "Whenever on the trial of any felony or misdemeanor, there shall appear to be any variance between the statement in the indictment or information and the evidence offered in proof thereof, . . . in the name or description of any matter or thing whatsoever therein named or described, . . . such variance shall not be deemed grounds for an acquittal of the defendant, unless the court before which the trial shall be had shall find that such variance is material to the merits of the case and prejudicial to the defense of defendant." The question of whether or not

a variance between the charge and the proof is material to the merits of the case and prejudicial to the defense of the defendants rests primarily in the discretion of the trial court. [State v. Fike, 324 Mo. 801, 24 S. W. (2d) 1027; State v. Jackson, 221 Mo. 478, 120 S. W. 66.] The case of State v. Carragin, 210 Mo. 351, 109 S. W. 553, was a prosecution for forgery. Defendant was the maker of the note, which was payable to himself. The indorsement of a third person was alleged to have been forged. The information contained no reference to the genuine indorsement of defendant, the payee, which appeared on the note in evidence. It was there contended that the writing alleged could not be the subject of forgery, unless the name of the maker and payee, they being one and the same person, be indorsed on the back of the note, and unless so indorsed the paper was a nullity, as it imposed no pecuniary liability upon anyone. In passing on the question of whether such a variance was material to the merits of the case, and prejudicial to the defense of the defendant, this court, speaking through GANTT, J., said,

"The circuit court has not so found, and we think it obvious that the mere omission in the information of the genuine indorsement of the defendant on the note is not reversible error."

And in State v. Jackson, 90 Mo. 156, 2 S. W. 128, where, as here, the charge was forgery, it was held that the mere fact the name of one Groves was written on the note by the company after it was delivered to it to indicate the agent in whose hands it was placed for collection, created no variance, inasmuch as, in describing the note in the indictment, it was not necessary to set that fact forth.

The words "Farm Account" in the left-hand corner of the note were no part of its purport, and therefore not required to be alleged. We are unable to perceive how or in what manner the omission of the hyphen connecting the names of appellant and the two prosecuting witnesses could possibly affect the merits of the case, or prejudice his defense. Manifestly the action of the trial court in admitting the note was proper, and appellant's contention in that regard is overruled. [State v. Sharpless, 212 Mo. 176, 111 S. W. 69; State v. Jackson, 221 Mo. 478, 120 S. W. 66; State v. Chick, 282 Mo. 51, 221 S. W. 10; State v. Hascall, 284 Mo. 607, 226 S. W. 18.]

II. It is contended that letters written by Messrs. Hilbert and Henderson to the payee bank, at or about the maturity date of the note in question, in which they separately disclaimed liability thereon, constitute declarations not made in the presence of appellant, and being mere hearsay, were inadmissible. They were introduced in rebuttal, and, as we glean from the record, were admitted by the court on the theory they were competent for the purpose of rebutting the testimony of defendant touching his authority. The rule against hearsay is the broadest of all rules of evidence, although subject to

exceptions as well established as the rule itself. [10 R. C. L., p. 959, sec. 133.] In the next succeeding paragraph of the text just mentioned there is stated this familiar doctrine: "Nor can evidence of what a witness has said out of court be received to fortify his testimony. It violates a first principle in the law of evidence to allow a party to be affected, either in his person or his property, by the declarations of a witness made without oath. And, besides, it can be no confirmation of what the witness has said on oath, to show that he has made similar declarations when under no such solemn obligation to speak the truth."

It is the State's position that the letters were admissible as explanatory of the testimony of the witnesses who prepared them, and as to the intent or purpose of declarants they were direct evidence. The cases relied on, however, do not sustain such contention. In State v. Newcomb, 220 Mo. 54, 119 S. W. 405, it was held, "The law is so well settled that the defendant cannot be bound by statements and acts of third parties made out of his presence that it needs no citation to establish it, but our own reports abound in decisions condemning the admission of such testimony. [State v. Jaeger, 66 Mo. l. c. 180; State v. Rothschild, 68 Mo. 52; State v. Patrick, 107 Mo. l. c. 152.]" We hold the writing of the letters referred to, and the declarations therein contained, were *res inter alios acta*, and, therefore, inadmissible against appellant. The fact of authority was a material issue in the case, and the statements in the letters were of such a damaging character as to seriously prejudice appellant's defense in the eyes of the jury.

■ III. Appellant assigns error in the giving of Instruction P-1, the State's main instruction, which is as follows:

"The court instructs the jury that if you believe from the evidence in the case beyond a reasonable doubt that the defendant T. I. Johnson, on or about the 1st day of December, 1928, at the County of Lewis and State of Missouri, did feloniously forge, counterfeit and falsely make the certain promissory note set forth in the indictment and introduced in evidence as State's Exhibit 'A' by which a pecuniary demand and obligation for the payment of twenty-four hundred dollars, by W. M. Hilbert and Lane B. Henderson to the LaGrange Savings Bank, of LaGrange, Missouri, was purported to be created, by attaching as makers thereto the names of W. M. Hilbert and Lane B. Henderson, with the intent then and there and thereby to injure and defraud any person, then and in that event the jury will find the defendant guilty as charged in the first count of the information and assess his punishment at a term in the penitentiary of not less than two years or more than seven years.

"And you so find the facts to be you will acquit the defendant."

The ground of the objection is that it purported to cover the

whole case, and directed a verdict, but wholly ignored appellant's defense of authority to sign the note—that is, that the names affixed to the note were placed thereon with the knowledge and consent of the purported makers thereof. We think the instruction open to the objection urged against it. It is obvious that the instruction, although purporting to cover the entire case, did not instruct upon all questions of law arising from the evidence, in that it ignored the vital issue of authority, just mentioned. We conclude that the giving of the instruction in the form in which it was given constituted reversible error. [State v. Slusher, 301 Mo. 285, 256 S. W. 817; State v. Gabriel, 301 Mo. 365, 256 S. W. 765; State v. Cantrell, 290 Mo. 232, 234 S. W. 800, l. c. 802.] While not urged as error, nor considered in reaching the conclusion hereinabove expressed, it may not be inappropriate to call attention to the fact that the concluding sentence of the instruction is defective and misleading (although in appellant's favor) because of the omission of the word "unless" between the first word "and" and the second word "you." Manifestly what the court intended to tell the jury was that unless the facts were found as hypothesized in the instruction they would acquit, and the sentence should have read, "And *unless* you so find the facts to be, you will acquit the defendant."

IV. State's Instruction P-4, under a point made in the brief, is vigorously assailed as casting upon the defendant the burden of proof to establish the defense of authority to sign the names of the prosecuting witnesses to the note, which, in express terms, it does. Appellant points out that the absence or lack of such authority is one of the elements of the offense which the prosecution must establish beyond a reasonable doubt, and, therefore, urges it was improper and prejudicial to give such instruction. Under the state of the record in which we find it, we are precluded from passing on the point thus raised because not properly preserved for review by the motion for new trial.

The errors herein noted necessitate a reversal of the case, and so we deem it unnecessary to discuss the other alleged errors assigned by appellant, which may not recur upon another trial. The judgment is reversed and cause remanded. *Ellison, P. J.*, and *Tipton, J.*, concur.