THE STATE v. MARK MURPHY, Appellant.—90 S. W. (2d) 103.

Division Two, January 4, 1936.

292

*Bagby & Burton, Edmund Burke* and *Hunter & Chamier* for appellant.

*Roy McKittrick*, Attorney General, and *Franklin E. Reagan*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant was convicted of murder in the first degree in the Circuit Court of Howard County on change of venue from Randolph County and his punishment assessed at imprisonment in the State penitentiary for life. He killed his brother, Paul Murphy. The homicide was admitted and the sole defense was insanity.

The motion for new trial contains fifty-three assignments of error which have been condensed into twenty-two assignments in appellant's brief in this court; but it will be unnecessary to consider most of these since we have concluded that the judgment must be reversed and the cause remanded.

At the time of the homicide the appellant was forty-one years old. He owned and operated a lumber yard, a garage and a hardware store at Higbee in Randolph County, and with his family lived in the second story of the building in which the hardware store was located. Paul Murphy, the deceased, was about thirty-eight years old. He and his two children were living with Mrs. Belle Murphy, mother of the deceased and the appellant, in her home in Higbee. About four-thirty in the morning of Tuesday, July 18, 1933, the appellant drove in his automobile from his home to the home of his mother armed with a pistol and a flashlight and went into the house through the back door. Thence by the aid of his flashlight he proceeded to the bedroom where his brother Paul Murphy lay asleep with his eight-year-old son and fired six shots into his back. Paul was found dead a few minutes later.

The State presented further testimony showing that the appellant had borrowed from a neighbor named Farris three days before the homicide the pistol with which he shot the deceased; and that he returned the weapon within half an hour after the shooting, giving as his reason for getting it that he ''wanted a gun he could depend upon.'' He admitted the killing to other neighbors, and to the officers of the law. To some of these he made the explanation that the deceased Paul Murphy four days earlier had threatened to kill him unless he made a settlement of their affairs arising out of a business relation hereinafter mentioned; and that he had scarcely slept since. The State further produced one expert witness, Dr. Francis Barnes, Jr., of St. Louis, and a number of lay witnesses who expressed the opinion that the appellant was sane at the time of the homicide.

For the defense, the evidence showed that the deceased Paul Murphy had harbored a bitter feeling toward the appellant for about five years arising out of the fact that he had been forced to turn back to the appellant a hardware store at Clark, in Randolph County, which he had previously bought from him. There was testimony that the deceased drank heavily thereafter and gave utterance to numerous threats and expressions of ill will against appellant, all of which were communicated to him by the persons who heard them. In some of these threats the deceased declared he would kill the appellant unless the latter made a settlement with him and paid him a stated sum of money, ten or fifteen thousand dollars.

According to the testimony of Mrs. Belle Murphy, mother of the two brothers, Mrs. Sophia Murphy, the appellant's wife, and two former

employees, this strained relation between the deceased and the appellant became crucial on Friday, July 14, four days before the homicide. On the evening of that day the deceased went to the appellant's store, drunk and armed, and demanded $10,000 in settlement of his claims, stating he would kill the appellant if the latter did not pay it. For the next three days both during the daytime and at night he stood watch for long periods across the street from the appellant's store and living quarters. Also he climbed into a truck used in making deliveries from the store and declared to the driver, "Well Mark knows what to expect."

By one or another of these same four witnesses it was shown that after the deceased Paul Murphy and his two children moved into the home of the mother at Higbee in April, 1933, there was a great change in the appellant. He became absent-minded, forgetful and irritable. The demand and threats made by the deceased on the Friday night before the homicide threw him into a state of extreme nervous agitation. The next day he went to Moberly and consulted the prosecuting attorney who told him he could have the deceased put under peace bond; or confined in an asylum if it could be established that he was insane; or, if he (appellant) were driven to the wall and in imminent danger of death or great bodily harm, he could use any force necessary to protect himself. The prosecuting attorney testified to this on cross-examination. The appellant went back to Higbee on the evening of that day, Saturday, and borrowed from Mr. Farris the pistol with which he committed the homicide.

It was further shown that during the four nights following the ultimatum delivered to him by the deceased Paul Murphy, the appellant was nervous, brooded, watched for his brother Paul out of the window of his apartment over the store, and slept very little. On the Tuesday morning of the killing he arose about four o'clock saying he was going fishing. He fixed a cup of coffee, left the house and returned about four-forty-five telling his wife, "It's all over. I shot Paul. I had to do it. It's all over now." Later when the prosecuting attorney had come to Higbee the appellant told him in the store: "Well, Laurence, you told me to do it;" and the prosecutor replied, "Yes, but I didn't tell you to do it that way."

The appellant's mother testified that her father, the appellant's grandfather, became insane and was confined in the State Hospital for the insane at Fulton for a year before his death in 1890. The records of that institution showed he was received on September 26, 1889. She also stated her father's sister, Annie Jackson was insane, but this evidence was excluded. Mrs Murphy further testified that her husband Mark Renfrow Murphy, the father of the appellant, became insane prior to 1895 and since had been confined continuously in the asylum at Fulton. He was still there at the time of the trial. She said his type of insanity was such that he was threatening to

kill his father. The records of the State Hospital at Fulton showed that he was received on June 24, 1895. For the appellant three expert witnesses, Dr. G. Wilse Robinson, Jr., of Kansas City, Missouri, Dr. W. A. Bloom of Fayette, and Dr. J. W. Winn of Higbee expressed the opinion that the appellant was insane. Eight lay witnesses testified to the same effect. The appellant did not take the witness stand. Further facts will be stated in the course of the opinion.

I. The first assignment of error complains that the trial court denied the appellant the right of cross-examining three witnesses. It will be recalled that the appellant borrowed from O. L. Farris the pistol with which he shot the deceased. Mr. Farris was called as a witness by the State and testified to that fact and to what the appellant said when he returned the weapon after the homicide. He had known the appellant intimately for thirty years. On cross-examination the appellant's counsel asked him to describe how the appellant looked when he returned the pistol. The State's counsel objected on the ground that the appellant could not cross-examine the State's witness "for the purpose of showing an affirmative defense," and the objection was sustained. Appellant's counsel then inquired what was the condition of the appellant's eyes. Thereupon the following occurred:

"MR. BURKE: We have the right to cross-examine him on anything he knows about this.

"THE COURT: I do not understand that to be the rule.

"MR. REAGAN: I would be glad to give the court some authority on it.

"THE COURT: Objection sustained at this time. (Exceptions saved.)

"MR. BURKE: We wish to make an offer here: we offer to show by this witness on cross-examination that when Mark Murphy (the appellant) came down to bring back the gun between four-thirty and five o'clock on Tuesday morning, July 18, he had a wild look out of his eyes—his eyes blazed—he was unnaturally pale—that he did not look at all like himself; that his voice did not sound like Mark Murphy's voice; that he would not talk whereas he had always been in the habit of conversing at length with the witness whenever they met; that he was highly nervous and excited; that he had the appearance of a person who was of unsound mind; that, based upon the conduct of the defendant at his house that morning and upon his looks and appearance and upon his actions and conversation, he appeared to be insane, and that, in his opinion, the defendant was insane at that time."

Continuing, counsel for the defendant offered to prove by the witness that he had known the appellant for a number of years; that within the past several months immediately preceding the killing,

he had noticed a distinct change in his apparent mental reactions to what was said to him in conversation; that upon a number of occasions in the two or three months preceding the killing he would direct a question to appellant at times and that appellant would apparently pay no attention to it; that he seemed not to comprehend the meaning of what was asked him or to pay any attention to the fact that a question was asked him; that he was moody for two or three months immediately preceding the shooting, and would stare in the witness's face upon occasions taking no interest in what was going on about him; and that, based on what he had seen of appellant in the past few months—his acts, his appearance, his conversation, and his conduct—he considered the appellant at the time of the killing, to be insane and incapable of distinguishing between right and wrong.

"THE COURT: It is premature.

"MR. BURKE: We offer to prove the facts just stated in order to disprove that the act was done with deliberation or malice, and we are offering it also to disprove the State's case, that the act was done with deliberation or with malice—that he was in such a frame of mind that he would not coolly deliberate on the act.

"THE COURT: Objection sustained at this time. It is premature.

"MR. BURKE: We not only offer this evidence, but we ask the privilege of cross-examining this man upon the matters heretofore stated.

"THE COURT: Objections sustained at this time. (Exceptions saved.)

Similar efforts by appellant's counsel to cross-examine the State's witnesses C. L. Feland and C. T. Williams met with the same result, whereupon proper exceptions were saved and like offers of proof dictated into the record. The next morning when court convened counsel for appellant renewed their requests to cross-examine the State's witnesses on the matter of the appellant's insanity at the time of the homicide, as follows:

"MR. BURKE: We ask to be heard on the court's ruling of yesterday, denying us the privilege of cross-examining the State's witnesses as to things that they observed concerning the condition of the defendant on the morning of the killing and their opinions thereon as to the sanity or insanity of the defendant. The case I am producing here is an old case in 136 Missouri, page 84. [State v. Lewis.]

"THE COURT: The Court rules that the defense will be permitted to present evidence upon the issue of insanity on the cross-examination of State's witnesses while upon the stand, but will be required to treat such witnesses as their own, and elicit such evidence by direct and not by leading questions, or the defense may re-introduce such witnesses as their own during defense of the case. I feel that it is im-

proper to lead a witness from whom the party seeks an opinion.

. . .

"Mr. Burke: The ruling is, we can cross-examine the witnesses now on other matters, and adopt them as our own later.

"The Court: Yes. (Exceptions saved.)"

Appellant contends the foregoing rulings violated Section 1727, Revised Statutes 1929, which provides:

"A party to a cause, civil or criminal, against whom a witness has been called and given some evidence, shall be entitled to cross-examine said witness (except where a defendant in a criminal case is testifying in his own behalf) on the entire case, but this shall not be construed to entitle a defendant who has pleaded a counterclaim or set-off in a civil case to cross-examine a plaintiff's witness in respect thereto, but as to said counterclaim or set-off such witness (if examined by defendant in relation thereto) shall be deemed defendant's witness and be so examined in the course of the trial."

The State answers, first, that the rulings were proper notwithstanding the statute, under State v. Lewis, 136 Mo. 84, 91, 37 S. W. 806, 808, and State v. Barbata, 336 Mo. 362, 378, 80 S. W. (2d) 865, 874, decided since the trial below. We think the Barbata case is not decisive of the question. The holding there expressly was that the assignment on that point was not before the court for review because no offer of proof was shown in the record from which it could be adjudged whether prejudicial error had been committed. It is true the opinion further cites State v. Lewis, supra, and says that decision sustains the view urged by the State there (in the Barbata case) and here. But it does not say it approves the Lewis case.

The Lewis case undoubtedly does sanction the course followed by the learned trial judge. It says, speaking of the defendant there on trial:

"If she committed the homicide the defense of insanity was an affirmative one, which could not properly be shown upon the cross-examination of the State's witness, and the court committed no error in so ruling. Moreover, the court announced that the witness could be recalled by defendant when it came to the defense. If she did not commit the homicide the evidence was inadmissible for any purpose, for under such circumstance the condition of her mind was immaterial. But the homicide being shown to have been committed by defendant the burden was upon her to show some legal justification or excuse for it, and if excusable upon the ground of insanity, it must have been shown to the reasonable satisfaction of the jury."

But the Lewis case was decided in 1896, nine years before the statute was first enacted; Laws 1905, page 307; and hence could not have been written with an eye thereto. However the case law of Missouri at the time and for many years before had permitted a party to cross-examine a witness of an adversary litigant on the

whole case, State v. Sayers, 58 Mo. 585, 586; State v. Brady, 87 Mo. 142, 145; State v. Soper, 148 Mo. 217, 235, 49 S. W. 1007, 1010; Ayers v. Railroad, 190 Mo. 228, 235 et seq., 88 S. W. 608, 609. And the learned Attorney General therefore argues that since the Lewis decision made an exception to the case law rule, as applied to a defendant in a criminal case presenting an insanity defense, it should still be recognized as authority and the same practice followed under the statute. On this point his brief says: ''Insanity like a citadel on a mountain top, stands alone, a complete law unto itself;'' that the presumption of innocence does not conflict with or destroy the presumption of sanity; that the burden of proof is on the defendant to establish the defense of insanity affirmatively by a preponderance of the evidence to the satisfaction of the jury; and that when the statute says a party to a criminal cause shall have the right to cross-examine a witness against him ''on the entire case'' it means only that a defendant may cross-examine the witness on the part of the State's case then being presented, i. e., on the case in chief, at that stage of the trial, or on matters in rebuttal when the witness is called in rebuttal.

The appellant contends proof of insanity negatives criminal intent, malice, premeditation, deliberation, etc., because a person who is insane is incapable of the mental processes necessary thereto. He further maintains that since the foregoing are essential ingredients of first degree murder, and since the State must prove every element of his guilt beyond a reasonable doubt, therefore insanity is not an affirmative defense, and the burden is not on the defendant to prove it but on the State to disprove it when that fact is in issue.

The rules contended for by the appellant—that the burden is on the State to prove sanity beyond a reasonable doubt when that fact is in issue—is said to be the ''orthodox view,'' 5 Wigmore on Evidence (2 Ed.), section 2501, page 482; or the ''prevailing rule,'' Glueck's Mental Disorder and the Criminal Law, section 3, page 41; or, ''the doctrine of principle, sustained by a large part of our courts, and rapidly becoming general,'' 3 Bishop's New Criminal Procedure (2 Ed.), section 673, page 1647.

The rule invoked by the State—that the burden of proof rests on the defendant to sustain the defense of insanity by a preponderance of the evidence to the satisfaction of the jury—is followed in many states. It is said of it that ''perhaps the current of modern authority is setting in favor of'' it, 13 Ruling Case Law, section 14, page 714; that it prevails ''in perhaps the majority of jurisdictions,'' 30 Corpus Juris, section 353, page 143; that it is ''being increasingly adopted,'' Glueck's Mental Disorder and the Criminal Law, section 3, page 42; and that it has been adopted ''by an increasing number of Courts,'' 5 Wigmore on Evidence (2 Ed.), section 2501, page

483. It has long been followed in Missouri, as shown by the cases cited below.*

If the question were new and open to our judicial determination we should incline to the view urged by appellant, as being more consistent and in accord with principle. A plea of insanity in Missouri is not a mere plea of nonamenability. [See 1 Wharton's Criminal Law (12 Ed.), sec. 80, p. 120.] It can and must be presented under the plea of not guilty and tried as a defense to the case on the merits. [State v. Crane, 202 Mo. 54, 81, 100 S. W. 422, 429.] Pure pleas of nonamenability admitting (for the purposes of the plea) the commission of a crime in all its elements may be presented in the same way: as, for instance, a plea of the Statute of Limitations, State v. Snyder, 182 Mo. 462, 503, 82 S. W. 12, 24; or of former jeopardy, Section 3664, Revised Statutes 1929; Ex parte Dixon, 330 Mo. 652, 655, 52 S. W. (2d) 181, 182.

We can see no sufficient reason why the law should discriminate against a defendant who was insane at the time of the commission of the homicidal act, by casting upon him the burden of establishing that defense by a preponderance of the evidence while throwing the mantle of presumptive innocence around a deliberate, calculating murderer as to other similar defenses. Suppose, for example, in such a case the defense were that the killing was accidental, or in self-defense, or in necessarily overcoming resistance to lawful arrest by an authorized conservator of the peace for commission of a felony, etc.; or in a prosecution for an assault by a married woman suppose the defense were that she acted under coercion of her husband. In all these instances for the purposes of the defensive plea the *act* of killing or assaulting would be admitted; and the denial would go only to the criminal intent; but under the law of this State it could not be contended the accused must assume the burden of proving himself, or herself, innocent by a preponderance of the evidence. [As to accidental homicide see Sec. 3986, R. S. 1929; 30 C. J., sec. 355, p. 146; self-defense, Sec. 3985, R. S. 1929; State v. Malone, 327 Mo. 1217, 1228, 39 S. W. (2d) 786, 790: lawful arrest, Sec. 3985, R. S. 1929; State v. Dierberger, 96 Mo. 666, 676, 10 S. W. 168, 171.

---

* Baldwin v. State, 12 Mo. 223, 233; State v. Huting, 21 Mo. 464, 476-7; State v. McCoy, 34 Mo. 531, 535, 86 Am. Dec. 121; State v. Klinger, 43 Mo. 127, 131 et seq.; State v. Hundley, 46 Mo. 414, 417; State v. Smith, 53 Mo. 267, 270; State v. Holme, 54 Mo. 153, 163; State v. Simms, 68 Mo. 305, 309; State v. Redemeier, 71 Mo. 173, 36 Am. Rep. 462; State v. Johnson, 91 Mo. 439, 443, 3 S. W. 868, 869; State v. Pagels, 92 Mo. 300, 309, 4 S. W. 931, 933; State v. Williamson, 106 Mo. 162, 173, 17 S. W. 172, 175; State v. Schaefer, 116 Mo. 96, 112, 22 S. W. 447, 451; State v. Wright, 134 Mo. 404, 418, 35 S. W. 1145, 1149; State v. Bell, 136 Mo. 120, 123, 37 S. W. 823, 824; State v. Lewis, 136 Mo. 84, 91, 37 S. W. 806, 808; State v. Duestrow, 137 Mo. 44, 88, 38 S. W. 554, 566; State v. Church, 199 Mo. 605, 639, 98 S. W. 16, 25; State v. Porter, 213 Mo. 43, 56, 111 S. W. 529, 531, 127 Am. St. Rep. 589; State v. Barker, 216 Mo. 532, 545, 115 S. W. 1102, 1105; State v. Barbata, 336 Mo. 362, 80 S. W. (2d) 865, 870.

9 Am. St. Rep. 380; State v. Coleman, 186 Mo. 151, 161, 84 S. W. 978, 980-1, 69 L. R. A. 381: coercion of husband, 30 C. J., sec. 420, p. 791; State v. Ma Foo, 110 Mo. 7, 15, 19 S. W. 222, 224, 33 Am. St. Rep. 414.]

There are two Missouri cases which sustain this view with respect to the defense of insanity: State v. Smith, 53 Mo. 267, 272, and State v. Speyer, 207 Mo. 540, 555, 106 S. W. 505, 510, 14 L. R. A. (N. S.) 836. And there is a strong dissenting opinion by HENRY, J., taking that side of the question in State v. Redemeier, 71 Mo. 173, 181, 36 Am. Rep. 462, 467. But, as already pointed out, the overwhelming weight of our decisions is in harmony with the State's contention, beginning with Baldwin v. State, 12 Mo. 223, 233, decided in 1848. This alone might not restrain us were it not for the fact that we have had a statute in this State since 1855, at least, which is consistent with this long line of decisions and inconsistent with the contrary view. The statute, now Section 3660, Revised Statutes 1929, since the amendment made by Laws 1883, page 78, has read as follows:

"When a person tried upon indictment for any crime or misdemeanor shall be acquitted on the sole ground that he was insane at the time of the commission of the offense charged, the fact shall be found by the jury in their verdict, and by their verdict the jury shall further find whether such person has or has not entirely and permanently recovered from such insanity; and in case the jury shall find in their verdict that such person has so recovered from such insanity, he shall be discharged from custody; but in case the jury shall find such person has not entirely and permanently recovered from such insanity, the prisoner shall be dealt with as provided in the two preceding sections."

Prior to 1883 it read as follows, Section 1, page 232, Revised Statutes 1855:

"When a person, tried upon indictment for any crime or misdemeanor, shall be acquitted on the sole ground that he was insane, the fact shall be found by the jury in their verdict, and the prisoner shall be dealt with as provided in the two following sections."

This statute clearly contemplates—indeed, it says—that when a defendant in a criminal case is acquitted on the sole ground that he was insane the jury shall find and state that fact in their verdict. Since 1883 the statute has further required the jury to find whether the defendant has entirely recovered, or not, from such insanity; and if it be found he has not recovered the statute requires him to be further dealt with according to law. Obviously this statute is incompatible with the theory that the jury may acquit when they entertain only a *reasonable doubt* as to the sanity of the accused. The same conclusion, drawn from a similar statute, is expressed in State v. Quigley, 26 R. I. 263, 276, 58 Atl. 905, 67 L. R. A. 322, 330, 3 Ann. Cas. 920, 926. We conclude, therefore, that the burden was

on the appellant to prove his insanity by a preponderance of the evidence as, or at least like, an affirmative defense.

But even so, it does not follow that the State's witnesses have been denied the right to cross-examine the State's witnesses in chief on the defense of insanity, State v. Lewis, 136 Mo. l. c. 91, ·37 S. W. l. c. 808, to the contrary notwithstanding. Our statute, Section 1727, explicitly says either party to a civil or criminal cause may cross-examine a witness called against him ''on the entire case;'' · except as to a counterclaim or set-off in a civil cause. It does violence to this plain language to argue, as the learned Attorney General does, that the section means a litigant may cross-examine an adversary's witness on the case in chief only, at that stage of the trial, or in rebuttal only at that stage of the case. The words ''on the entire case'' mean *the whole case* and can mean nothing less.

As stated earlier in this opinion, even prior to the first enactment of the statute in 1905 our decisions permitted a litigant to cross-examine an adversary witness on the whole case. But State v. Roe (Mo. Div. 2), 180 S. W. 881, 885, holds the statute changed the rule, citing Ayers v. Wabash Railroad Co., 190 Mo. 228, 236, 88 S. W. 608, 609. The Ayers case declares the case law rule simply amounted to permitting the cross-examining party to bring out that much of his own case in advance while the adversary witness was on the stand; but that as to the new matter thus brought out the witness became the witness of the cross-examining party. On the other hand, under the statute—the Roe case in effect says—the witness so cross-examined remains the witness of the party producing him, throughout, and the cross-examiner may ask him leading questions and generally conduct the examination as against an adversary witness. Whether or not the Ayers case is correct in its exposition of the prior law, the statute has always been construed as just stated. [State v. Martin, 229 Mo. 620, 638, 129 S. W. 881, 886, Ann. Cas. 1912A, 908; State v. Hersh (Mo. Div. 2), 296 S. W. 433, 436 (9); Wilcox v. Erwin (Mo. App.), 49 S. W. (2d) 677, 679 (5); A. Graf Distilling Co. v. Wilson, 172 Mo. App. 612, 626, 156 S. W. 23, 27; Reding v. Reding, 143 Mo. App. 659, 673, 127 S. W. 936, 940.]

Now it is true that the trial court has considerable discretion in controlling the scope of cross-examination, State v. Barnes, 325 Mo. 545, 551, 29 S. W. (2d) 156, 158. But ordinarily great latitude is allowed, especially in criminal cases. [State v. Albritton, 328 Mo. 349, 364, 40 S. W. (2d) 676, 680.] And in this case the trial court evidently considered its discretion controlled by the rule of law announced in the Lewis decision, 136 Mo. l. c. 91, 37 S. W. l. c. 808, and held the appellant could only examine the State's witnesses in chief on the defense of insanity as if they were his own witnesses, without asking them leading questions. This was substantial error against the appellant. The fact that insanity is an affirmative defense makes

no difference. The only exception allowed by the statute applies to counterclaims and set-offs in a civil action. In a civil case, for illustration, there is no question about the fact that a defendant can cross-examine the plaintiff's witnesses on the defense of contributory negligence. It is done every day. And certainly the defense of contributory negligence is as much of an affirmative defense as is the defense of insanity in a criminal case. If any difference, the rule ought to be, and is, broader in a criminal case where life and liberty are at stake. The Lewis case, supra, is overruled on this point.

■ II. The State contends further that even though it was error, as we have just held, to deny to the appellant the right to cross-examine the State's witnesses in chief, O. L. Farris, C. L. Feland and C. T. Williams on the defense of insanity, nevertheless the error was not prejudicial and was cured because the appellant recalled these witnesses as his own after the State had rested its case in chief, and elicited from them testimony that in their several opinions appellant was insane at the time of the commission of the homicide. In support of this proposition the learned Attorney General cites State v. Baker, 262 Mo. 689, 697, 172 S. W. 350, 353; State v. Kebler, 228 Mo. 367, 381, 128 S. W. 721, 725, and State v. Harris, 209 Mo. 423, 443, 108 S. W. 28, 34. The first two of these cases are not in point. In each of them the error was cured because the witness had been interrogated on the point involved in another part of the *cross-examination*. In other words, the defendant had been allowed to question the witness under the liberal rules applicable to cross-examination.

The Harris case is more in point but the facts are different. There the defendant had offered testimony that the general reputation of the prosecuting witness for peace and quiet was bad. The State then called witnesses who testified to the contrary that his reputation was good. In cross-examining these latter witnesses defendant's counsel inquired of them if they had ever heard of certain assaults the prosecuting witness had committed on named persons. The trial court excluded these questions. This court held that since the defendant had amply proven the bad reputation of the prosecuting witness for quarrelsomeness by other witnesses it was not prejudicial error to exclude the proof of the specific incidents. From this it will be seen the excluded testimony did not prevent the defendant from presenting fully his side of the question.

State v. Sayres, 58 Mo. 585, 586, in a general way is in line with the State's contention. The facts and ruling there are shown by the following excerpt from the opinion:

"It seems that a witness was examined for the prosecution, and upon his cross-examination, defendant's counsel asked him questions, in reference to matters not brought out by the examination in chief. This was objected to, and the court sustained the objection. It is

true the ruling was not in accordance with the decisions of this court. We have followed the English practice in this respect, which allows a party on cross-examination to examine on all subjects pertinent to the case without regard to whether they were touched upon in the direct examination or not. But it is difficult to see how the defendant can complain here, as when he opened the case on his side, he called the same witnesses, put the questions to them that were ruled out before, and obtained *all the evidence that was sought upon the cross-examination.*" (Italics ours.)

In the instant case when the appellant recalled the witnesses Farris, Feland and Williams as his own, they were asked about the appearance of the appellant shortly after the homicide and concerning their opinion as to his sanity at the time of the homicide; and they all expressed the opinion that he was insane. But the examination of the witnesses was constantly interrupted by objections that certain questions were leading or called for conclusions. Nine times during the examination of the witness Feland and three times during the examination of the witness Farris answers to questions on these matters were stricken out for this reason, and the examinations were halted by objections many other times on the theory that the appellant must adhere to the rules governing direct examinations.

It is going too far to hold that error in denying the right of cross-examination is cured if the party later examines the witnesses as his own on the same points, even though he succeeds in eliciting favorable responses from them—unless we are able to say he made a showing substantially as good as he would have made had he been permitted to avail himself of the more liberal rules of cross-examination which were his due. We cannot say that in this case, and we have no right to speculate where the remaining years of the life of a human being are at stake.

The appellant committed a brutal and unnatural homicide. He shot his brother in the dead of night as the latter lay asleep in their mother's home with his infant son. The enormity of the act suggests a doubt of his sanity. His father had been insane and confined in an asylum for many years. His maternal grandfather had died in an asylum. The State produced witnesses who told of statements made by the appellant within half an hour after the killing tending to show premeditation and deliberation. By putting these witnesses on the stand the State vouched for their credibility. They could have told also of his appearance and demeanor when he made the statements, which indicated to them that he was insane. A cross-examination at that time would have been more likely to take the sting out of their testimony adduced by the State. But the court (following the Lewis case) would not permit the appellant's counsel to cross-examine them on the issue of insanity.

The following day the court changed its ruling and said it would

allow appellant's counsel to interrogate State's witnesses on the issue of insanity, but only on condition that as to that issue the witness became appellant's witnesses, subject only to direct examination. It was then too late for the appellant to take advantage even of this meager privilege with respect to the three witnesses Feland, Farris and Williams. So appellant called them when his side of the case was reached. They were laymen unlearned in the subtleties of the law. They persisted in saying the appellant "appeared very nervous," that he "didn't look the same" and "didn't act the same" when they talked to him right after the killing as he had before. A number of these answers were stricken out. In our opinion all this did not cure the error committed in denying the appellant's right to cross-examine them in orderly fashion while the State had them on the stand. It may be added, too, that the course followed by the trial court has the effect of depriving the defendant of an opportunity to impeach State's witnesses in chief with respect to unfavorable testimony given by them on the issue of insanity, and would afford the State an opportunity to impeach its own witnesses on that point.

■ III. A number of assignments in the motion for new trial and briefs are addressed to alleged errors in the admission and exclusion of evidence. It is unnecessary to pass on these in detail in view of the conclusion we have reached on the assignment already discussed. We may say, generally, that considerable latitude should be allowed a defendant in the admission of evidence offered to prove insanity; that the law fixes no particular limitation as to the period of time which the inquiry may cover; but that the evidence must bear on the mental condition of the accused at the time of the commission of the act charged. [State v. Tarwater, 293 Mo. 273, 293, 239 S. W. 480, 486; State v. Warren, 317 Mo. 843, 297 S. W. 397, 402.] Testimony was introduced both by the State and the defense that the deceased Paul Murphy claimed the appellant owed him a large amount of money. The appellant sought to show this was untrue and we think he had a right to do so, as it showed the provocative nature of the accused's conduct and tended to disprove the appellant had any mercenary motive for the killing, which facts in turn had a bearing on his insanity defense. But he was not entitled to dilate on these matters and show in detail his benefactions to the deceased through the years.

■ IV. Under the evidence in this record we can see no basis for a manslaughter instruction, and think the court did not err in refusing to give one. [State v. Bongard, 330 Mo. 805, 813, 51 S. W. (2d) 84.] The case of State v. Davis (Mo. Div. 2), 34 S. W. (2d) 133, 135, so far as in conflict with the Bongard case on that point was overruled by the latter, though not mentioned. [See, also, State v. Clough, 327 Mo. 700, 704, 38 S. W. (2d) 36, 38.]

■ V. The court gave two principal instructions for the State, one on first degree murder and one on second degree murder. The former required the jury to find the appellant killed the deceased feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought. The latter made the same requirements save that it excluded the element of deliberation. The court also gave an instruction on the defense of insanity of which appellant does not complain. But error is assigned in that the two principal instructions did not mention the defense of insanity and contain a proviso or saving clause with respect thereto. On this point appellant cites: State v. Helton, 234 Mo. 559, 137 S. W. 987; State v. Gabriel, 301 Mo. 365, 374, 256 S. W. 765, 767; State v. Malone, 327 Mo. 1. c. 1234, 39 S. W. (2d) 786, 793; State v. Johnson, 334 Mo. 10, 20, 64 S. W. (2d) 655, 659.

An examination of these cases will show that in each of them, except possibly the Johnson case, the principal instructions complained of called for a conviction *in spite of* the defenses interposed. In other words they were so phrased that they failed to negative the existence of the defenses relied on, and they were inconsistent with other instructions presenting those defenses. But in the instant case the principal instruction on murder in the first degree (we need not consider the instruction on murder in the second degree, since the appellant was not convicted thereunder) required the jury to find that the appellant "feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought" killed the deceased. If the appellant did do that he was not insane; and therefore the jury could not have been misled by the omission from the instruction of a proviso mentioning the defense of insanity, which latter was fully covered by another instruction. [State v. Douglas, 312 Mo. 373, 403, 278 S. W. 1016, 1025; State v. Lewis, 248 Mo. 498, 504, 154 S. W. 716, 719; State v. Aurentz, 315 Mo. 242, 250, 286 S. W. 69, 72; State v. Glass, 318 Mo. 611, 616, 300 S. W. 691, 693; State v. Albritton, 328 Mo. 349, 366, 40 S. W. (2d) 676, 681.]

■ VI. As stated, the court gave at the request of the State a principal instruction on murder in the second degree. The appellant contends the court should have given the further instruction, as a part of the law of the case, that the intentional killing of a human being is presumed to be murder in the second degree, citing four decisions of this court. We are unable to find where any of them so hold. It is true there is such a presumption, *nothing else appearing*. [State v. Majors, 329 Mo. 148, 157, 44 S. W. (2d) 163, 167 (10).] But in this case the facts did appear. It was the duty of the jury to draw their conclusion from these facts and not to base it upon a presumption. We refer to this point although it is really not before us, since the appellant was not convicted of murder in the second degree, because it may arise on a retrial.

For the reasons given the judgment is reversed and the cause remanded. All concur.